Chris A. Hollinger (SBN 147637)
chollinger@omm.com
Kaitlyn A. Gosewehr (SBN 313458)
kgosewehr@omm.com
Andrew N. Ezekoye (SBN 360536)
aezekoye@omm.com
O'MELVENY & MYERS LLP
2 Embarcadero Ctr. 28th Floor
San Francisco, California 94111
Telephone:     (415) 984-8700
Facsimile:     (415) 984-8701

Laura K. Kaufmann (SBN 329714)
lkaufmann@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street
Suite 1900
Los Angeles, California  90071-2811
Telephone:     +1 213 430 6000
Facsimile:     +1 213 430 6407

Asher Smith (NY Bar #5379714)*
ashers@petaf.org
Raquel Panza (NY Bar #5963251)*
rpanza@petaf.org
PETA FOUNDATION
1536 16th Street NW
Washington, DC 20036
(202) 483-7382; (202) 540-2208 (fax)
[*Application to appear *pro hac vice* forthcoming]

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| People for the Ethical Treatment of Animals, Inc.<br><br>         Plaintiff,<br><br>   v.<br><br>The Barry R. Kirshner Wildlife Foundation; Roberta Kirshner; Sean Castro; Brian Thomas; Janra Enterprises; Terrific, LLC; Megan Swartz; Big Cat Refuge; Ryan Carlson; and John-Thomas Terlitsky,<br><br>        Defendants. | No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## I. **INTRODUCTION**

1.     This is a citizen lawsuit, brought pursuant to Section 11(g)(1)(A) of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, to address Defendants' past and ongoing violations of the ESA and its implementing regulations by owning, operating, and perpetuating the Barry R. Kirshner Wildlife Foundation ("Kirshner")—one of the worst roadside zoos in America.

2.     Kirshner is an unaccredited, self-described animal "sanctuary" located in Oroville, California that operates pursuant to tax-exempt status under Section 501(c)(3) of the Internal Revenue Code. For decades, Kirshner has promoted itself as a safe haven for animals, claiming to offer "rehabilitation and long-term care" and to provide for the special needs of animals with neurological and physical impairments. In reality, Kirshner is a grim warehouse for captive animals—many of whom are confined alone in cramped cages; left to suffer from physiological degeneration, musculoskeletal injuries, and festering open wounds without adequate medical treatment; deprived of the psychological and environmental enrichment necessary to stave off stereotypic or self-injurious behavior; and even denied basic nutrition and sanitary conditions.

3.     Now, in the wake of a shutdown led by the State of California, Defendants have initiated a quiet rebrand—an effort to transfer Kirshner's facilities and ESA-protected animals to new front and shell companies that would allow the animal cruelty to continue under a new name.

4.     The conditions at Kirshner are not merely suboptimal, they are deplorable and—as time has shown—deadly. These conditions also are illegal. The surviving animals—including federally-protected tigers, lions, leopards, clouded leopards, cheetahs and a single lemur that Kirshner stashed and now seeks to reclaim—have suffered enough. Some are living out the long-term consequences of chronic malnutrition, including from untreated metabolic bone disease ("MBD")—a progressive illness caused by nutritive deficiencies that manifests as decreased muscle mass, pain, lameness, and pathologic bone fractures. Others are visibly overweight or emaciated. Confined in Kirshner's filthy, dilapidated facilities for years on end, many of them have been observed endlessly pacing in their tiny enclosures, exhibiting unmistakable signs of severe psychological distress. Some have died of heat exposure, others of chronic malnutrition or untreated wounds. Their suffering is embedded in the fabric of Kirshner's infrastructure, institutional culture,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

and legacy.

5.    By confining ESA-protected lemurs, tigers, lions, lion-tiger hybrids, leopards, snow leopards, clouded leopards, cheetahs, and ocelots (collectively, the "Listed Species") in undersized cages, denying them proper veterinary care and appropriate nutrition, denying them adequate enrichment, and using them as props for public display and handling, among other egregious misconduct, Kirshner and its owners and operators have harmed, harassed, and killed Listed Species in violation of the ESA and its implementing regulations.

6.    The evidence is overwhelming. Federal inspectors and state regulators counseled, warned, cited, and fined Kirshner over and over for failing to provide the bare, legally required minimum: adequate veterinary care, safe housing, proper nutrition, and humane conditions. But nothing changed. After decades of failed intervention, the California Department of Fish and Wildlife ("CDFW") finally denied Kirshner's Restricted Species Permit—thereby terminating its legal authority to possess high-risk animals such as large felids, non-human primates, alligators, and bears—citing egregious violations of state animal welfare laws.[1] The violations persisted. In February 2025, the CDFW initiated a criminal investigation and ordered that the restricted species be removed from Kirshner's custody.

7.    Instead of cooperating with state and federal animal-welfare personnel and improving the plight of the animals in their care, Kirshner's operators have responded with outrage, entitlement, and defiance. After racking up dozens of U.S. Department of Agriculture ("USDA") citations, and just a few months before the CDFW formally revoked Kirshner's Restricted Species Permit and initiated its criminal investigation, Defendants Roberta Kirshner (acting in her capacity as the Trustee of the Robert A Kirshner Revocable Trust), Sean Castro, and Brian Thomas quietly sold Kirshner's real property (including the location of its roadside zoo) to Terrific, LLC. Terrific, LLC is controlled by Janra Enterprises, a Nevada conglomerate known not for its expertise in caring

---

[1]    The California Fish and Game Commission designates certain species as "restricted" based on the risks their captivity poses to public safety, native wildlife, agriculture, and the animals' own welfare. *See* Cal. Fish & Game Code § 2118; Cal. Code Regs. Tit. 14, §§ 671(a)-(c). While these restrictions are distinct from federal ESA protections, many restricted species are also listed under the ESA, which independently protects them from prohibited "takes" under federal law. *See* 16 U.S.C. § 1538(a)(1)(B)-(D).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  for animals, but for its sprawling adult entertainment empire. To facilitate the transfer of its

2  operations, Kirshner packed up their ESA-listed animals and carted them off the premises, stashing

3  them at other locations to avoid confiscation by government regulators—but with the stated intent

4  of bringing them back to Kirshner.

5      8.      To that end, a campaign has been launched to "Bring [the animals] home"—home

6  to the same filthy grounds, barren cages, rotting food, inept animal care, and psychological torment

7  that government officials worked to shut down.[2]

8      9.      The ESA exists to protect the most vulnerable animals from precisely this type of

9  prolonged, institutionalized abuse. Kirshner has flouted the ESA's mandates for years, causing

10  immeasurable harm to countless animals under its control. Kirshner and its successors are now

11  attempting to resurrect the facility and regain custody of the animals they neglected and abused

12  under the banner of newly-formed, nominally-distinct entities managed by adult entertainment

13  conglomerate Janra Enterprises, notorious nationwide strip-club managers Ryan Carlson and John-

14  Thomas Terlitsky—who control various animal-themed non-profit shell corporations, including

15  Big Cat Refuge, California Wildlife Refuge, and Midwest Wildlife Refuge. If their scheme is not

16  halted, additional ESA-prohibited takes will predictably occur.

17      10.     Plaintiff PETA brings this action to safeguard the remaining ESA-protected animals

18  once held by Kirshner who are believed to be in the possession of third parties unfit to care for

19  federally protected animals, and who are in imminent danger of being returned to Kirshner's

20  facilities. These animals have endured years of inadequate medical care, chronic malnutrition,

21  preventable disease, psychological torment, social and environmental deprivation, and exposure to

22  dangerous public contact. They must not be forced back into the care of the same unfit custodians,

23

---

24  [2]      *See Bring us home!*, Change.org, https://www.change.org/p/bring-us-home (last visited June 16, 2025)
(requesting signatures for a petition to bring the relocated "Kirshner animals back [to] Butte County," mentioning

25  "Adara, Alex, Amari, Amur, Axel, Bernie, Bow, Chapman, David Allen, Ellie, Isaac, Joyce, Kaia, Leyah, Lucie,
Maji, Majestic Lapua, Mema, Outlaw, Royal, Samson, Savara, Skippy, Tshuma, Zeus, Zuri and the Kinkajous [ESA-

26  protected big cats and lemur, along with other animals]"); *see also* Emails from Ryan Carlson to CDFW (copying
Jacob Markow) (Feb. 26, 2025) at 4 (on file with author); Angela Bracco, Sec'y of Kirshner, Butte Cnty. Bd. Of

27  Supervisors Meeting (Feb. 25, 2025), 00:09:56, available at https://buttecoca.portal.civicclerk.com/event/446/media;
Letter from Joan Gulla, Facility Manager of Kirshner, to CDFW (Feb. 11, 2025) (attached as **Exhibit 1**); Letter from

28  Ryan Carlson, President of California Wildlife Refuge, Inc., to Joshua Morgan, Chief, License and Revenue Branch,
CDFW (Jan. 16, 2025) (attached as **Exhibit 2**).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

presumably within the same rotting infrastructure, and should instead be relocated to adequate facilities where they may express species-typical behaviors in safe, sanitary, and enriching environments and receive proper nutrition and veterinary care—all as Congress intended when it enacted the ESA.

## II. JURISDICTION AND VENUE

11.     This Court has personal jurisdiction over Defendants Roberta Kirshner, Sean Castro, and Brian Thomas because they are domiciled in the State of California and/or conduct(ed) business and engage(d) in actions relevant to the allegations in the Complaint within the State of California.

12.     This Court has personal jurisdiction over Defendants Megan Swartz, Ryan Carlson, and John-Thomas Terlitsky because they conduct(ed) business and engage(d) in actions relevant to the allegations in the Complaint within the State of California. This Court also has personal jurisdiction over Defendants the Barry R. Kirshner Wildlife Foundation, Janra Enterprises, Terrific, LLC, and Big Cat Refuge (a/k/a California Wildlife Refuge (formerly Midwest Wildlife Refuge)) because their principal places of business are located in the State of California and/or they conduct(ed) business and engage(d) in actions relevant to the allegations in the Complaint within the State of California.

13.     This Court has subject matter jurisdiction of ESA claims under the citizen suit provision of the ESA, 16 U.S.C. § 1540(g), and has federal question jurisdiction under 28 U.S.C. § 1331.

14.     Plaintiff provided notice regarding the violations alleged in this Complaint and its intent to file suit ("Notice of Intent"). It is attached as **Exhibit 3**. Plaintiff sent the Notice of Intent to Defendants, the Secretary of the Interior, and the Director of the U.S. Fish and Wildlife Service ("FWS") on March 17, 2025. Plaintiffs served their Notice of Intent more than sixty days prior to the filing of this action. *See* 16 U.S.C. § 1540(g)(2)(A)(i).

15.     Defendants have not remedied the violations set out in the Notice of Intent.

16.     The Secretary of the Interior has not commenced an action against Defendants to impose a penalty under the ESA or its implementing regulations. The United States has not commenced a criminal prosecution against Defendants to redress ESA-related violations. *See* 16

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   U.S.C. § 1540(g)(2)(A)(ii)–(iii).

2   17.   Venue is proper in the Eastern District of California because the alleged ESA

3   violations have occurred, and continue to occur, within this judicial district. *See* 16 U.S.C.

4   § 1540(g)(3)(A).

5   ### III. PARTIES

6   18.   Plaintiff PETA is a Virginia non-stock corporation and animal protection charity

7   under Section 501(c)(3) of the Internal Revenue Code. It is headquartered in Norfolk, Virginia.

8   **A. Kirshner Defendants**

9   19.   Defendant Barry R. Kirshner Wildlife Foundation ("Kirshner") is located at 4995

10  Durham-Pentz Road in Oroville, California 95965. It was established in 1994 and operates under a

11  Class C USDA exhibitor license (93-C-0504). Until December 2024, Kirshner also held a

12  Restricted Species Permit, issued by the CDFW, which allowed it to possess and exhibit animals

13  classified as "restricted" under California regulations. In December 2024, the CDFW denied

14  Kirshner's application to renew its Restricted Species Permit based on violations of the California

15  Fish and Game Code, including animal welfare violations. Following this permit denial, in February

16  2025, the CDFW initiated a criminal investigation into Kirshner and began efforts to relocate some

17  of the animals at Kirshner to adequate facilities. By that time, Kirshner had already transported its

18  ESA-protected species to other facilities with the intent of later reclaiming and returning them to

19  Defendants' squalid Oroville compound.

20  20.   Defendant Roberta Kirshner's last known residence is at 4995 Durham-Pentz Road,

21  Oroville, California 95965, in a sprawling gated ranch custom built on the same property where

22  Kirshner, for years and years, confined numerous animals—including large animals like lions,

23  tigers, leopards, and bears—in tiny 400-square-foot kennels. At all times relevant to the allegations

24  in the Complaint, Ms. Kirshner acted on behalf of the Defendant Barry R. Kirshner Wildlife

25  Foundation by, among other things, overseeing day-to-day operations, managing animal care, and

26  participating in USDA inspections.

27  21.   Defendant Sean Castro is, on information and belief, a resident of Sacramento,

28  California. He has had significant involvement with Kirshner and the conduct of Kirshner's

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

business since at least the mid-late 1990s. The Articles of Association for Kirshner, which appear to have been executed at some point between August 29, 1995 and April 17, 1997, list Mr. Castro as one of the five individuals "appointed to act as the initial Directors" of Kirshner. Kirshner's publicly available tax documents filed with the Internal Revenue Service ("IRS") between 2012 and 2018 designate Castro as an "Individual Trustee or Director" of Kirshner and report that Castro provided at least 1,500 hours of services to Kirshner during this time. Until October 2024, Castro was the owner—along with Defendant Brian Thomas and the Roberta A Kirshner Revocable Trust—of the real property located at 4995 Durham-Pentz Road in Oroville, where Kirshner relocated its roadside zoo operation from the neighboring city of Durham in 2010. On October 15, 2024, Castro (along with Thomas and the Roberta A Kirshner Revocable Trust) signed a grant deed to transfer the property to Terrific, LLC. This property is where the Janra Defendants are now attempting to resume Kirshner's operations under the new name(s) "Big Cat Refuge" and "California Wildlife Refuge."

22.     Defendant Brian Thomas (a/k/a Thomas Brian Castro) is, on information and belief, a resident of San Diego County, California. He was designated as one of Kirshner's "officers, directors, [and/or] trustees" in publicly-available tax documents filed with the IRS in 2012, 2013, and 2023. Until October 2024, Thomas was the owner—along with Defendant Sean Castro and the Roberta A Kirshner Revocable Trust—of the real property located at 4995 Durham-Pentz Road in Oroville. On October 15, 2024, Thomas (along with Castro and the Roberta A Kirshner Revocable Trust) signed a grant deed to transfer the real property to Terrific, LLC.

**B. Janra Defendants**

23.     Defendant Janra Enterprises ("Janra") is a business entity organized and existing under the laws of the State of Nevada, headquartered at 7451 Eastgate Road, Henderson, Nevada, 89011. Janra is engaged in the operation of numerous adult businesses, including Déjà Vu Services, Inc ("Déjà Vu")—one of the largest operators of "strip clubs" in the U.S., also headquartered at 7451 Eastgate Road, Henderson, Nevada, 89011; a retail chain called Suzie's Adult Superstore, which has numerous brick and mortar stores in several states where customers can rent and view pornographic videos onsite in the stores' "arcade," and also sells adult products online; and several

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

other adult retail outlets across the country. Janra has been the subject of prior employment litigation involving allegations of unsafe and unsanitary conditions at its businesses, including that Janra's retail employees were required to clean up used condoms, drug paraphernalia, urine, and feces from inside and outside of a Suzie's Adult Superstore, where Janra management allegedly "encouraged" customers to engage in illegal sexual activity, including masturbating and utilizing so-called "glory holes" inside the store's pornography viewing booths.[3] In another lawsuit, filed in 2020, employees at a Suzie's Adult Superstore in Hawaii sued the company for unlawful termination after they were allegedly fired for refusing to keep the store open during the Covid-19 shutdown.[4] Janra has been a plaintiff in numerous lawsuits against municipalities, challenging local laws regulating adult entertainment businesses, including those aimed at preventing "criminal activity" in panorama booths at Suzie's, and others aimed at keeping adult entertainment businesses away from areas frequented by minors.[5] Despite Janra's extensive record of opposing and evading regulatory oversight in other highly sensitive and risk-prone industries, the Janra Defendants now feign a willingness to submit to the vast system of federal, state, and local captive wildlife regulations governing their emerging exotic animal enterprise.

24.     Defendant Janra's website claims that it has "donated [its] time and money to support . . . Exotic Wildlife Conservation," that "a portion of every sale" of its adult products "goes toward exotic animal conservation," and that its "mission is to contribute toward the conservation of exotic wildlife through significant financial contributions to worthy wildlife refuge programs."[6] Janra has been attempting to enter the animal entertainment business for several years. Specifically, business filings and real estate transaction records from Pennsylvania, Missouri, Nevada, and California show that agents of Janra have filed articles of incorporation establishing numerous

---

[3]     *See Cynthia Renfrow v. Janra Enterprises Inc.*, case no. 655140 (Super. Ct. Stanislaus Cnty., June 22, 2010), case details available at Courthouse News Service, https://www.courthousenews.com/not-for-the-faint-of-heart-2/.

[4]     *See Haraguchi et al. v. Suzie's Retail HI Inc*, No. 1CCV-20-0001665 (Haw. Cir. Ct. 1st Cir. Dec. 2020).

[5]     *See, e.g., Janra Enterprises, Inc., dba Suzie's Adult Superstore v. City and County of Honolulu*, 107 Hawai'i 314 (Hawaii Sup. Ct. June 6, 2005); *Janra Enterprises, Inc. v. City of Reno*, 818 F. Supp. 1361 (D. Nev. 1993).

[6]     *See Charitable Efforts*, JanraStores.com, https://janrastores.com/ (last visited June 17, 2025).

apparent shell tax-exempt exotic animal "refuges."[7] These entities all list Janra's corporate headquarters as their mailing address and Ryan Carlson—CEO of Janra's Déjà Vu adult entertainment empire—as their president, chairman of the board, director, and/or CEO. These entities have no staff, public programming, or physical infrastructure. They do not function as legitimate sanctuaries or serve any discernable charitable purpose for animals or otherwise. This is not a new tactic. It closely mirrors other schemes orchestrated by Janra and Defendant Carlson, including in the State of Indiana, where a newly formed Janra-affiliated entity (Clarksville Ministries) was created "[a]s part of a shell game to keep Theatre X [an adult film theatre] operating" after it was shuttered by local regulators due to the rampant criminal activity occurring there.[8] As with Theatre X, Carlson and other Janra affiliates are attempting to keep Kirshner operating by using nominal ownership changes to obscure continuity of operations and evade regulatory enforcement.

25.   Defendant Terrific, LLC ("Terrific") is a Janra-owned California limited liability company. Terrific's Articles of Organization, filed with the California Secretary of State on August 16, 2024, list the initial street address of Terrific's principal office as 5138 Auburn Boulevard, Sacramento, California 95841—the location of a Suzie's Adult Superstore, and its initial mailing address as 7451 Eastgate Road, Henderson, Nevada—Janra's corporate headquarters. The Articles of Organization list the "organizer" as Defendant Megan Swartz—an employee of Janra serving as Déjà Vu's Director of Purchasing, who—like Defendant Ryan Carlson—has extensive experience in adult entertainment but none in animal care. On October 15, 2024, Terrific purchased the property located at 4995 Durham-Pentz Road in Oroville, California—including over 18 acres of

---

[7]   In this context, a "shell" entity is a business entity that has no physical presence (other than a mailing address) that can be manipulated to obscure company structure, ownership, and activities. Shell entities raise concerns because they may be used, as here, to facilitate the concealment of beneficial ownership, evade oversight, and mask centralized control. Such arrangements often function as vehicles for fraud (including self-dealing, diversion of assets, tax evasion, and money laundering). *See* U.S. Dep't of the Treasury, Fin. Crimes Enf't Network, *Potential Money Laundering Risks Related to Shell Companies* (Nov. 9, 2006), https://www.fincen.gov/resources/statutes-regulations/guidance/potential-money-laundering-risks-related-shell-companies.

[8]   *See* Order Holding Clarksville Ministries LLC in Contempt at 4, *Midwest Ent. Ventures, Inc. v. Town of Clarksville*, No. 10C04-1905-PL-000051 (Ind. Cir. Ct. Clark Cnty. Sept. 14, 2023).

land encompassing Kirshner's' facilities and animal enclosures—from the Roberta A Kirshner Revocable Trust, and Defendants Sean Castro and Brian Thomas.

26.     Defendant Big Cat Refuge, which also operates under the trade names California Wildlife Refuge and Midwest Wildlife Refuge (collectively, the "Janra Exotic Animal Tax-Exempt Entities"), is a tax exempt 501(c)(3) corporation incorporated by Ryan Carlson, a controversial figure in the adult entertainment industry and longtime principal and corporate officer of Déjà Vu and, on information and belief, corporate officer of Janra. The Janra Exotic Animal Tax-Exempt Entities appear to have first cropped up in May 2022, when Carlson incorporated Midwest Wildlife Refuge as a non-profit in Pennsylvania, and then registered it as a foreign non-profit corporation in Missouri shortly after, on July 20, 2022.

27.     Between 2022-2024, Midwest Wildlife Refuge's only publicly-reported financial activities consisted of the receipt of donations from another Janra-controlled tax-exempt organization, the Lanie Albrecht Foundation—established in the family name of Janra's founder Ralph Albrecht and run by Sharon Wong, corporate principal of numerous Janra-affiliated businesses for over 25 years.[9] This circular funding structure, whereby Janra channels money through a series of nonprofit entities controlled by its own corporate officers, repeatedly changing names and jurisdictions, reflects a pattern federal tax authorities recognize as a red flag for the misuse of shell entities and tax-exempt organizations, including concealment of financial control, self-dealing between related entities, and misuse of tax-exempt status for private gain.[10]

28.     On July 30, 2024, Defendant Carlson changed the name of the Janra Exotic Animal Tax-Exempt Entities from Midwest Wildlife Refuge to California Wildlife Refuge in the State of Pennsylvania. The next day, Defendant Carlson registered the California Wildlife Refuge as a foreign non-profit corporation in California and subsequently withdrew Midwest Wildlife Refuge from the state of Missouri.

---

[9]      Publicly-filed tax documents show that the Lanie Albrecht Foundation holds over $15 million worth of assets—most of which are contributions from Ralph Albrecht's Family Trust, including a 2018 contribution of over $6.5 million described as an "Investment in Janra Enterprises, Inc., and Related Entities."

[10]     *See generally* Internal Revenue Serv., IRS Comm'r Testimony: Charitable Giving Problems and Best Practices (June. 22, 2004), https://www.irs.gov/pub/irs-news/ir-04-081.pdf.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

29.    On January 3, 2025, Defendant Carlson established the next iteration of the Janra Exotic Animal Tax-Exempt Entities in California—this time using the name Big Cat Refuge. Articles of Incorporation filed with the California Secretary of State explain: "The specific purpose of this corporation is to provide the finest natural sanctuary for exotic wildlife in need by providing permanent, lifetime care along with wildlife conservation education programs to our local communities to promote public awareness of the plights of exotic species."

30.    The Janra Exotic Animal Tax-Exempt Entities were poised to take over the ownership and operations of Kirshner beginning in late 2024, after Terrific purchased the property at 4995 Durham-Pentz Road in Oroville from the Roberta A Kirshner Revocable Trust, and Defendants Sean Castro and Brian Thomas. In January, 2025, Big Cat Refuge listed Kirshner's address in Oroville as its headquarters in filings with the California Secretary of States, and, around the same time, began advertising tickets for a Big Cat Refuge Guided Tour at that address, where the public could "get up close and personal with each species" for $24, a screencap of which is in the attached **Exhibit 4**. Big Cat Refuge's website claims that it keeps a "carefully catalogued photo album of [its] animals on [its] Facebook." The hyperlink directs users to the "Current Residents" section of the "Barry R. Kirshner Wildlife Sanctuary" page.[11]

31.    Meanwhile, in late 2024 and early 2025, Defendant Carlson sought approval from the CDFW to transfer Kirshner's operations, including its ownership and physical possession of Kirshner's ESA-listed species, to California Wildlife Refuge.[12]

32.    Defendant Megan Elizabeth Swartz is the principal of Defendant Terrific, LLC and Director of Purchasing for Déjà Vu. Terrific, LLC's apparent sole purpose was to facilitate acquisition of Kirshner while obscuring Janra's centralized control. Swartz's role in forming Terrific appears to employ a familiar tactic already employed in prior court proceedings, in which, Janra's executives engage in serial creation of shell entities using rotating Janra personnel to

---

[11]    *See* Big Cat Refuge, *Animals*, BigCats.org, https://bigcats.org/animals/ (last visited June 30, 2025) (follow "Facebook" hyperlink to https://www.facebook.com/media/set/?vanity=bigcatrefuge&set=a.969508598544202 (displaying the public Facebook page historically attributed to Kirshner with published content dating back to at least 2015).

[12]    *See* Ex. 2 at 2.

obscure operational continuity.[13] Such structural obfuscation is core to Janra's corporate strategy and has been employed in other states to fragment entities and conceal true control.

33.    Defendant Ryan Carlson is CEO of Déjà Vu Services, Inc and, on information and belief, a corporate officer of Janra, where he manages Janra's adult entertainment enterprise and its network of affiliated strip clubs. Carlson appears to maintain effective control over both enterprises despite shifts in formal titles.[14] These strip clubs have been tied to a string of shootings, commercial sex trade investigations, and labor exploitation inquiries.[15] As of 2020, Carlson was personally subject to wage garnishment and accused of hiding assets in connection with a $7.3 million fraud judgment entered against him by a Nevada court who found he had engaged in a scheme to defraud the owners of a Las Vegas strip club he managed through unauthorized credit card charges and cash theft.[16] Defendant Carlson is also the president, chairman of the board, director, and/or CEO of various nascent, Janra-affiliated 501(c)(3) tax-exempt corporations established for the stated purpose of "provid[ing] . . . sanctuary for exotic wildlife[.]" These include Big Cat Refuge, California Wildlife Refuge, Midwest Wildlife Refuge, and potentially others—two of which have been registered, dissolved, and subsequently re-registered in numerous states, including Pennsylvania, Missouri, Nevada, and California. As numerous courts have already recognized, with

---

[13]    *See, e.g.*, Order Holding Clarksville Ministries LLC in Contempt at 4, *Midwest Ent. Ventures, Inc. v. Town of Clarksville*, No. 10C04-1905-PL-000051 (Ind. Cir. Ct. Clark Cnty. Sept. 14, 2023).

[14]    *See* Notice of Filing Deposition Transcripts at 7, *Midwest Ent. Ventures, Inc. v. Town of Clarksville* No. 10C04-1905-PL-000051 (Ind. Cir. Ct. Clark Cnty. Jan. 16, 2023) (Michael Sanchez, President of Janra, "testified that Ryan Carlson, CEO of Deja Vu Services, Inc., is also the highest paid person [ ] at Janra Management—which operates [Clarksville Ministries]—and that the Janra entities share a building with Deja Vu.").

[15]    *See, e.g.*, Tony Cook and Alexandria Burris, *Character matters. It's a state law. So what about owners of strip club with violent past?*, IndyStar (Mar. 21, 2023), https://www.indystar.com/story/news/2023/03/21/bad-bars-indianapolis-club-onyx-owners/70007623007/ (describing Ryan Carlson as "one of the nation's largest strip club owners," and outlining Carlson's "controversial history" in the adult entertainment industry); Erin Mulvaney & Joyce E. Cutler, *Strippers Turn to Unions After Litigation, Legislation Falter*, Bloomberg (May 31, 2022), https://news.bloomberglaw.com/daily-labor-report/strippers-turn-to-unions-after-litigation-legislation-falter.

[16]    *See, e.g.*, *In re Ryan David Carlson*, No. 20-71002-swd, 2020 WL 1933924 (Bankr. W.D. Mich. Apr. 21, 2020) (regarding Ryan Carlson's alleged attempts to avoid wage garnishment in connection with a $7.3 million fraud judgement entered against him in favor of his former employer Club Paradise); *CP Food & Beverage, Inc. v. United States Fire Insurance Company*, 324 F. Supp. 3d 1172 (D. Nev. 2018) (finding Ryan Carlson's thefts at Club Paradise were not covered by Club Paradise's insurance policy because Ryan Carlson primarily stole money from customers rather than from Club Paradise); *CP Food and Beverage, Inc. v. Ryan Carlson*, No. A-14-709594-C (Nev. Dist. Ct. Clark Cnty. July 13, 2017) (entering judgment in the amount of $7,342,901 against Ryan Carlson and other former employees of Club Paradise following allegations of fraud and cash theft).

this recurring pattern of rapid incorporation, multi-state registration, and repeated name changes across Janra-controlled entities, Carlson and Janra are operating a "shell game" to shield their operations from meaningful, continuous oversight.[17]

34.     Defendant John-Thomas Terlitsky is an employee of Déjà Vu, and—like Defendant Carlson—involved in the operation of Déjà Vu-managed strip clubs, including Little Darlings in Las Vegas, Nevada. Defendant Terlitsky is also the CFO and Secretary of Big Cat Refuge, which—according to public filings with the California Secretary of State—was based at Janra's Henderson, Nevada headquarters before moving to Kirshner's Oroville, California address in January of 2025. John-Thomas Terlitsky has been working in the adult entertainment industry, and specifically for Déjà Vu, since at least 2011. Like the other Janra Defendants, Terlitsky has no identifiable experience in animal care, advocacy, education, or outreach.

## IV. <u>STATUTORY BACKGROUND</u>

### ENDANGERED SPECIES ACT

35.     The ESA prohibits the "take" of any endangered or threatened species, unless otherwise permitted by a Section 4(d) special rule, within the United States. 16 U.S.C. § 1538(a)(1)(B), (G); 50 C.F.R. §§ 17.21(a) & (c), 17.31(a). Wildlife subject to the ESA includes any listed member of the animal kingdom. 16 U.S.C. § 1532(8).

36.     A "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The term "harm" is defined by regulation as an act which "kills or injures" an endangered or threatened animal. 50 C.F.R. § 17.3. The term "harass" is defined by regulation to mean an "intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." *Id*.

---

[17]     *See* Order Holding Clarksville Ministries LLC in Contempt at 4, *Midwest Ent. Ventures, Inc. v. Town of Clarksville*, No. 10C04-1905-PL-000051 (Ind. Cir. Ct. Clark Cnty. Sept. 14, 2023). *See also* Order Holding Midwest Entertainment Ventures, Inc. in Contempt at 4-6, *Midwest Ent.* (Apr. 4, 2023); *United States v. Mohney*, 949 F.2d 1397 (6th Cir. 1997); *U.S. v. Klein*, 19 F.3d 20, 1994 WL 70854, *1 (6th Cir. Mar. 3, 1994); *In re Carlson*, No. BK-S-19-16289, 2020 WL 1933924, *3 (W.D. Mich. Bankr. 2020).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# V.  **FACTUAL ALLEGATIONS**

### A.  **Kirshner Takes Animals in Violation the ESA**

37.     Kirshner's takings of various ESA-listed animals are detailed by species below.

### i.     **Kirshner takes ring-tailed lemurs in violation of the ESA.**
#### a.     *Kirshner harms, harasses, and—on information and belief—has killed ring-tailed lemurs by denying them proper social groupings and environmental enrichment.*

38.     Ring-tailed lemurs are highly social primates. In their native habitat of Madagascar, wild ring-tailed lemurs live in dynamic, matriarchal groups of 7 to 30 individuals, where they form strong bonds and engage in complex and consistent social interactions with one another.

39.     These social interactions are likewise essential to the physical and psychological health of lemurs in captive environments. According to the Association of Zoos and Aquariums ("AZA"),[18] lemurs in captivity should be housed in compatible social groupings so as not to inhibit their ability to engage in natural behavioral patterns.[19]

40.     As explained by the federal district courts in *PETA v. Tri-State* and *Kuehl v. Sellner*, depriving lemurs of adequate social groupings constitutes a "take" under the ESA because it does not meet the bare minimum standards of care for nonhuman primates under the Animal Welfare Act ("AWA");[20] is not a generally accepted animal-husbandry practice; and leads to behavioral abnormalities, physiological changes, and disruptions in species-typical activities.[21]

---

[18]     The AZA is a zoological accreditation organization comprised of animal welfare, conservation, and zoological professionals that establishes professional standards for zoological facilities based on modern and accepted animal welfare and husbandry science and professional standards.

[19]     *See* Ass'n of Zoos and Aquariums, *Eulemur Care Manual* (2013), at 24.

[20]     The AWA sets forth the standards for proper care and treatment of exhibited animals. *Graham v. San Antonio Zoological Soc'y*, 261 F.Supp.3d 711, 738 (W.D. Tex. 2017). Unlike the ESA, there is no citizen-suit provision within the AWA. Instead, the AWA charges the Secretary of Agriculture (within the USDA) with the administration and enforcement of the AWA. *See* 7 U.S.C. §§ 2146, 2132(b). In considering the interplay between the AWA and the ESA in ESA citizen suits, courts recognize that the AWA and the ESA "are separate, complimentary statutes, and although they overlap and cover the same subject matter, claims under the ESA are not precluded by the AWA." *See PETA v. Wildlife in Need and Wildlife in Deed*, 476 F.Supp.3d 765, 781 (S.D. Ind. 2020) (reiterating holding from Order Denying Def.'s Motion to Dismiss (ECF No. 88) at 6-8 (S.D. Ind. Feb. 8, 2018)). Because the definition of "harass" under the regulations implementing the ESA contains an exception for generally accepted, AWA compliant animal husbandry practices not likely to result in injury, courts consider whether an exhibitor's practice complies with the AWA for the purpose of determining whether a "take" has occurred within the meaning of the ESA. *See id.*

[21]     *See PETA v. Tri-State Zoological Park*, 424 F. Supp. 3d 404, 414 (D. Md. 2019); *Kuehl v. Sellner*, 161 F. Supp. 3d 678 (N.D. Iowa 2016).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

41.    Despite well-established animal-husbandry practices, scientific knowledge, and federal case law confirming the complex social needs of lemurs, Kirshner has repeatedly housed its ring-tailed lemurs in isolation. On information and belief, Kirshner has kept Lulu—its only surviving ring-tailed lemur—without a single companion for years, relegating her to a life of total isolation in direct conflict with her species' highly social nature.

42.    Photographs from several site visits to Kirshner's facility over the years depict ring-tailed lemurs confined in enclosures containing no more than two ring-tailed lemurs at any given time.

43.    On June 15, 2022, the USDA cited Kirshner for housing Lulu alone and failing to provide for her psychological wellbeing. Specifically, the USDA found: "A recent death of a ring-tailed lemur left a single ring-tailed lemur at the facility. The individual is unable to see and hear nonhuman primates of their own or compatible species."

44.    On information and belief, Kirshner continued to house Lulu in complete isolation long after the USDA issued this citation, causing continuing psychological and physical injury.

45.    Ring-tailed lemurs also require environmental enrichment to meet their behavioral and cognitive needs. The AWA mandates that "[t]he physical environment in the primary enclosures must be enriched by providing means of expressing noninjurious species-typical activities." 9 C.F.R. § 3.81(b). Examples of enrichment under the AWA regulations include perches, swings, mirrors, manipulable objects, and foraging opportunities. *See id*. The AWA regulations further require that exhibitors "develop, document, and follow an appropriate plan for environmental enhancement adequate to promote the psychological well-being of nonhuman primates" like ring-tailed lemurs. 9 C.F.R. § 3.81. They also mandate that individually housed primates be given "special attention regarding enhancement of their environment." 9 C.F.R. § 3.81(c).

46.    Accordingly, numerous federal district courts have held that housing lemurs in isolation and without adequate enrichment constitutes a take in violation of the ESA. For example, in *PETA v. Tri-State Zoological Park of Maryland*, the court found that deprivation of social and environmental enrichment constitutes harassment under the ESA because it causes "frustration,

boredom, depression, lethargy, aggression, and impaired learning and coping," which disrupt lemurs' species-typical behaviors, such as "marking, foraging, grooming, exploring, and vigilance," which in turn creates a likelihood of further injury. *See* 397 F. Supp. 3d 768, 772–73 (D. Md. 2019).

47.     Despite these legal requirements, Kirshner has a longstanding practice of depriving its lemurs of necessary enrichment. Specifically, Kirshner has housed lemurs, including the lone survivor Lulu, in barren enclosures lacking species-specific structural features; sensory stimuli; and adequate opportunities for foraging, exploration, and play.

48.     On information and belief, the only objects provided for stimulation—such as a life-size plastic children's car—are neither appropriate nor sufficient for meeting a lemur's complex psychological needs, and the poor physical condition of these items suggests they are not regularly cleaned nor rotated to ensure novelty or even safe usability.

49.     Kirshner's failure to provide ring-tailed lemurs with adequate enrichment has persisted since at least 2014. That year, the USDA cited Kirshner for having "no written plan of environmental enhancement" for the two lemurs alive at the time, and instructed Kirshner that such failure violates the AWA.

50.     Kirshner's denial of social companionship and enrichment has inflicted psychological and physiological injury on countless lemurs over the years. These conditions harmed, harassed, and—on information and belief—ultimately killed lemurs Chez, Austin, Ilia, Shaka, Zuki, and potentially four additional ring-tailed lemurs whose whereabouts remain unknown.

51.     Accordingly, Kirshner's repeated failures to provide lemurs with adequate social and environmental enrichment constitute a prohibited take within the meaning of the ESA. On information and belief, Kirshner is engaged in an ongoing take of Lulu, who was transferred by Kirshner to an undisclosed location to avoid confiscation by the CDFW.

### b. Kirshner harms, harasses, and—on information and belief—has killed ring-tailed lemurs by failing to provide them with adequate nutrition.

52.     Proper nutrition is essential to the physical health and psychological wellbeing of

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

ring-tailed lemurs. Federal regulations implementing the AWA require that food be "wholesome, palatable, and free from contamination and of sufficient quantity and nutritive value to maintain all animals in good health." 9 C.F.R. § 3.129(a).

53.    Generally accepted animal husbandry practices provide that captive ring-tailed lemurs should be fed a species-specific diet consisting of commercial primate biscuits, fresh produce, and locally available browse. Federal regulations further require that food "be prepared with consideration for the age, species, condition, size, and type of the animal." *Id*.

54.    The USDA has cited Kirshner repeatedly for its failure to comply with these basic legal requirements. On one occasion, USDA inspectors noted that Kirshner had "no feeding plan by species approved by a veterinarian." The inspectors observed that "what was being fed was unclear, as it seemed to depend somewhat on daily donated foodstuffs." Although Kirshner provided a letter from a veterinarian stating that she had reviewed the diet and deemed it appropriate, the inspectors found that the approved diet was not documented. These and other findings demonstrate the inadequacy of Kirshner's nutritional program and lack of expertise of the individuals overseeing its implementation.

55.    In addition to failing to meet nutritional requirements, Kirshner has prepared and provided food under unsanitary and hazardous conditions. The USDA documented that produce— a critical component of lemurs' diets—was "stored in the garage without refrigeration" and "found to have significant molding and deterioration." Inspectors also noted that some animals were being served moldy food.

56.    During the same inspection, USDA officials found that food was being fed on wooden planks that were not being adequately cleaned between feedings. The food preparation area was observed to have worn surfaces, damaged cutting boards, and rusty cutting implements. Freezers used to store meat contained accumulated meat juice and other contaminants, while the surrounding areas were cluttered, dusty, and showed signs of rodent infestation.

57.    Inspectors also found that bags and containers of food were broken or left open with spilled food present and that hazardous substances, including chemicals and an unprotected rodent bait block, were stored near the animals' food.

58.    These unsanitary and hazardous conditions not only cause illness but also deny lemurs the opportunity to engage in species-typical food handling and foraging behavior, which significantly interferes with natural feeding behaviors and causes physical and psychological distress.

59.    As the court found in *People for Ethical Treatment of Animals, Inc. v. Lowe*, failing to provide ESA-protected species with nutritionally adequate, species-specific diets and offering deteriorating food constitutes an unlawful take in violation of the ESA. *See* No. CIV-21-0671-F, ECF No. 483 (Findings of Fact and Conclusions of Law), ¶ 9 (W.D. Okla. Feb. 25, 2022).

60.    Since 2012, the USDA has cited Kirshner at least eight times for deficiencies in feeding and nutrition, most recently in June 2024. Kirshner's chronic failure to implement a consistent, nutritionally adequate veterinarian-approved feeding plan tailored to the needs of ring-tailed lemurs, combined with the provision of moldy, contaminated, and affirmatively dangerous food, has injured and—on information and belief—killed multiple lemurs who died while in Kirshner's "care."

61.    Accordingly, Kirshner's longstanding and ongoing failure to provide adequate nutrition constitutes an unlawful take within the meaning of the ESA.

### c. Kirshner harms, harasses, and—on information and belief—has killed ring-tailed lemurs by denying them a sanitary environment.

62.    Ring-tailed lemurs, like all primates, require clean and well-maintained environments to protect their health and psychological well-being. Exposure to unclean and hazardous conditions creates a substantial likelihood of and causes disease, physical injury, and psychological distress.

63.    The USDA has repeatedly cited Kirshner for failing to meet even the most basic sanitation standards within its facility, including in areas surrounding the ring-tailed lemurs' enclosures.

64.    Specifically, Kirshner has been cited for leaving containers of standing water throughout the property—some of which were described by USDA inspectors as being dark in color, putrid in smell, and filled with aquatic insects.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

65.     On information and belief, Kirshner feeds lemurs rotten, moldy, and contaminated food. During the course of one inspection, USDA officials observed that non-frozen meat was left unrefrigerated for over an hour. Additionally, produce—an essential part of a ring-tailed lemur's diet—was found to have significant mold and deterioration, and some animals were being fed moldy food. USDA inspectors also documented that animals were fed from wooden planks that were not adequately cleaned between feedings. The food preparation area was found to have worn surfaces, damaged cutting boards, and rusted cutting tools, all of which pose contamination risks. Food storage areas were similarly unsafe: chemicals including bleach, paint, bags of cement, and even car batteries were stored next to foodstuffs; multiple food bags and containers were found open with spilled food present; at least three freezers had accumulated meat juice or other filth; and a rodent bait block was observed sitting unprotected next to food supplies. In one garage used for food storage, USDA inspectors found piles of cardboard boxes and miscellaneous discarded items. Tarps and more boxes were heaped on the ground in the food preparation area, where meat and produce were handled. Additional storage structures contained broken-open bags of feed and layers of dust and debris.

66.     In an outdoor cleaning area, buckets, bowls, crates, and cages were observed to be dirty and covered in rainwater and decomposing organic material, and inspectors determined they had not been cleaned for more than a day.

67.     Kirshner was also cited for allowing grasses and weeds to grow to knee height between animal enclosures and the perimeter fence. USDA inspectors instructed Kirshner that premises should be kept clean and in good repair in order to protect animals from injury, and that weeds, grasses and bushes must be controlled to facilitate cleaning of the premises and to reduce or eliminate breeding and living areas for rodents, insects, and other animals that could serve as vectors of disease.

68.     Additionally, photographic evidence from site visits shows algae growth between layers of substrate around the ring-tailed lemurs' enclosure, creating a likelihood of contamination and illness from exposure to bacteria.

69.     The harmful conditions described above, on information and belief, have caused

disease transmission and injury to the lemurs in Kirshner's care. Chronic exposure to toxins, spoiled food, organic waste, rodent and insect infestations, dirty food surfaces, and bacteria lead to injury, illness, and death.

70.     Furthermore, because ring-tailed lemurs rely heavily on olfactory signals for communication, unsanitary conditions cause them acute psychological injury. As recognized by the court in *Kuehl v. Sellner*, unsanitary conditions "interfere with the lemurs' olfactory senses, to which they are highly attuned," likening their experience to "a human being in a room where there is constantly white noise being amplified." 161 F. Supp. 3d 678, 703 (N.D. Iowa 2016).

71.     In this way, persistent exposure to filthy, smelly conditions not only increases the likelihood of physical harm but also impairs a lemur's ability to exhibit species-typical behaviors such as scent-marking and foraging, which in turn creates a likelihood of further injury.

72.     These conditions have harmed, harassed, and—on information and belief—ultimately killed ring-tailed lemurs confined in Kirshner's unsanitary facilities. Accordingly, Kirshner's chronic failure to provide a clean and sanitary environment constitutes an unlawful take under the ESA.

### d.   Kirshner harms, harasses, and—on information and belief—has killed ring-tailed lemurs by subjecting them to improper handling and public contact.

73.     Ring-tailed lemurs are sensitive, intelligent primates who are particularly vulnerable to stress and injury when subjected to improper handling or close contact with humans and other non-compatible species. The ESA prohibits such forced proximity because it causes physical and psychological injury and significantly interferes with lemurs' normal behavior, specifically by causing chronic distress and fear and disruptions in species-typical behavioral patterns.

74.     Kirshner's lemur enclosures are insufficiently equipped to safely house the animals, particularly during feeding and cleaning. On information and belief, the lemur enclosures lack transfer areas or lockouts—spaces that allow staff to safely separate or confine lemurs during husbandry routines—leaving the animals with no means of retreat when humans enter their enclosures for feeding or cleaning. This creates persistent, daily stress, deprives the lemurs of the ability to regulate interactions in a species-typical manner, and thus exposes them to constant

harassment.

75.    A 2017 video taken at Kirshner shows a volunteer entering a lemur enclosure and aggressively clapping, yelling "NO! GET BACK!", and jabbing at a solitary lemur with a broom. The lemur, unable to retreat, frantically darts around the enclosure in apparent panic—displaying signs of agitation, fear, and distress.

76.    Another video from 2019 captures a similar interaction between a different volunteer and a ring-tailed lemur named Ilea, who has since died. Again, the volunteer enters the enclosure engaging in loud vocalizations and threatening physical gestures as Ilea exhibits signs of fear and panic.

77.    Some examples, among the many instances of improper handling of lemurs at Kirshner, are shown below, as well as in the attached **Exhibits 5-6:**






BKWF staff entering the enclosure of a ring-tailed lemur and jabbing at the lemur with a broom, Dec. 7, 2017

BKWF staff entering the enclosure of a ring-tailed lemur wielding a broom, May 4, 2019

78.    These interactions reflect a pattern of unsafe and inhumane practices that cause fear,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

injury, and disruption to the lemurs' normal behavioral routines. Lack of staff training and basic facility infrastructure contribute to the problem by allowing repeated harassment to go unaddressed.

79.    Kirshner also has failed to install adequate barriers to prevent inappropriate public contact. On information and belief, members of the public have been permitted to enter lemur enclosures and interact with lemurs at close range, including for photo opportunities.

80.    Forced contact with humans has been shown to cause psychological distress and suppress species-typical behaviors in non-human primates. Studies confirm that involuntary handling reduces social grooming, foraging, and other natural activities, resulting in replacement by stress-induced stereotypic behaviors.

81.    By facilitating direct interaction between the public and ring-tailed lemurs, Kirshner, on information and belief, causes injury, disease transmission, and psychological trauma. These encounters also deprive lemurs of the ability to choose when and how to engage with humans, which further disrupts their behavioral autonomy and causes harm.

82.    These practices constitute harassment and harm under the ESA because they cause injury and significantly interfere with the lemurs' essential behavioral patterns, including avoidance of perceived threats, territorial regulation, and scent communication.

83.    These failures are a cause of persistent physical and psychological distress—injuring and, on information and belief, ultimately killing lemurs at Kirshner, including Ilea.

84.    Accordingly, Kirshner's unsafe handling practices, including its facilitation of inappropriate public contact, harms, harasses, and on information and belief kills lemurs, constituting a prohibited, ongoing take of Lulu—who is, on information and belief, still owned by Kirshner—and numerous other lemurs who died in Kirshner's custody.

*e.    Kirshner harms, harasses, and—on information and belief—has killed ring-tailed lemurs by denying them adequate veterinary care and medicating them without a veterinarian's input.*

85.    Adequate veterinary care is essential to the health and welfare of ring-tailed lemurs and is a basic requirement under the AWA and generally accepted animal husbandry practices. The denial of prompt and appropriate veterinary intervention causes needless suffering and injury and

creates a substantial likelihood of further harm.

86.    On information and belief, Kirshner has repeatedly failed to ensure that ring-tailed lemurs in its custody receive veterinary evaluation, diagnosis, and treatment. These failures have resulted in prolonged illness, suffering, and, in some cases, death.

87.    According to former volunteer accounts published in a USDA complaint, two ring-tailed lemurs, Shaka and Zuki, died after being denied necessary veterinary care. Shaka reportedly showed signs of serious illness, including excessive sleep and refusal to eat for multiple days. Rather than calling a veterinarian, Defendant Roberta Kirshner, who is not a veterinarian, instructed volunteers to administer intravenous fluids containing electrolytes and water.

88.    By the time Shaka was finally transported to a veterinarian, her condition was terminal, and she died shortly thereafter. No necropsy was performed to determine the cause of death, and, according to a former volunteer, Ms. Kirshner provided incomplete and inconsistent accounts of the circumstances surrounding Shaka's decline and death.

89.    Several weeks later, Zuki, Shaka's enclosure mate, began displaying similar symptoms and, like Shaka, languished over the course of several weeks and died without veterinary care. Ms. Kirshner reportedly attributed Zuki's death to kidney stones.

90.    As the court in *PETA v. Tri-State Zoological Park* explained, "[p]erforming a necropsy is a basic standard of care, especially on an animal protected by the ESA." *See* 424 F. Supp. 3d 404, n. 4. (D. Md. 2019). "Necropsies provide a definitive diagnosis for cause of death and help the zoo understand the cause and prevent it from affecting other animals." *Id*. A systematic lack of necropsies would thus cause further deaths.

91.    On information and belief, this pattern of neglect is systemic at Kirshner. Between 2014 and 2024, the USDA cited the facility during at least ten separate inspections for failing to provide adequate veterinary care to multiple species.

92.    These citations reflect facility-wide deficiencies in veterinary oversight and demonstrate that Kirshner lacks anything close to sufficient systems for identifying illness, documenting symptoms and treatments, or consulting and properly communicating the animals' conditions with adequately trained veterinary professionals.

93.     On further information and belief, Kirshner's longstanding practice of withholding necessary veterinary care, administering unprescribed medical treatments, and failing to conduct post-mortem evaluations has killed at least five ring-tailed lemurs in Kirshner's custody.

94.     These practices harm and harass the ring-tailed lemurs while they are alive by subjecting them to preventable physical injury and psychological anguish and disrupting species-typical behaviors, such as normal grooming, foraging, and daily activity patterns.

95.     Kirshner's conduct also deprives the facility of critical diagnostic information that could prevent the spread of disease or recurrence of fatal conditions among the surviving animals.

96.     Accordingly, by denying veterinary attention, inappropriately medicating animals without veterinary input, and failing to conduct necropsies, Kirshner has harmed, harassed, and—on information and belief—killed ESA-protected ring-tailed lemurs in violation of the ESA.

**ii.   Defendants take tigers in violation of the ESA.**
   ***a.   Kirshner harms, harasses, and—on information and belief—has killed tigers by depriving them of environmental enrichment.***

97.     Tigers are solitary, wide-ranging carnivores whose physical and psychological welfare depends on having large, complex, and stimulating environments. In the wild, they inhabit territories that span miles and include rivers, dense vegetation, and a variety of prey. They are highly intelligent, curious, and active animals, exhibiting a range of natural behaviors such as stalking, swimming, climbing, scent marking, and chasing prey.

98.     In captivity, tigers require enriched environments to avoid boredom, distress, and physical degeneration. A lack of appropriate enrichment causes tigers to suffer from psychological ailments and exhibit stereotypic behaviors, including pacing, self-injury, excessive grooming, and head swinging. Beyond mere indicators of boredom, these behaviors are symptoms of mental distress and physical deterioration.

99.     Proper enrichment for captive tigers includes large enclosures with sufficient vertical and horizontal space, varied terrain, vegetation, water features for swimming and cooling, elevated resting platforms, and objects that encourage natural foraging and hunting behaviors. Effective enrichment programs rotate items, offer novel scents, use feeding games (such as food

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

puzzles), and present tigers with opportunities for problem-solving and exploration.

100.    On information and belief, Kirshner provides none of these enrichments. Instead, it confines its tigers to extremely small enclosures—estimated to be no larger than 20 feet long by 20 feet wide (i.e., only 400 square feet)—far below the AZA-recommended minimum of 1,200 square feet for a solitary tiger. These cages are barren, with hard, compact dirt floors and no vegetation, trees, grass, or any form of structural complexity.

101.    There are no ledges or platforms for resting, no adequate hiding spaces for privacy or temperature regulation, and no meaningful climbing or digging opportunities. Water basins, if present at all, are shallow and inadequate for the tigers to swim, cool off, or fully submerge themselves.

102.    An example of the grossly inadequate housing and lack of environmental enrichment for Kirshner's tigers is shown below, as well as in the attached **Exhibit 7**:



Tigers pacing in a row of tiny, barren cages, where they spend their entire lives without opportunities to engage in species-typical activities.

103.    These deplorable conditions deny the tigers the ability to express their natural behaviors, leading to psychological suffering and physiological harm. The lack of environmental enrichment causes severe stress, which, as the court found in *PETA v. Tri-State*, leads to chronic stress, hypertension, respiratory and cardiac distress, suppression of the immune system, atrophy of the hippocampus, myopathy, injury, and ultimately death. *See* 424 F. Supp. 3d at 418.

104.    Tigers confined in such barren environments cannot stalk, pounce, hide, or exercise. They are forced to exist in a perpetual state of sensory and behavioral deprivation, which constitutes harassment and harm under the ESA by causing physical injury (including from lack of exercise), acute and chronic distress, and by creating a likelihood of further injury through significantly

interfering with essential behavioral patterns.

105.    The absence of environmental complexity and enrichment at Kirshner has caused the tigers physical and psychological injury and created a daily reality of monotony and unrelenting stress. This chronic confinement in an environment lacking adequate enrichment has harmed, harassed, and—on information and belief—killed tigers.

### b. Kirshner harms, harasses, and—on information and belief—has killed tigers by denying them adequate nutrition.

106.    Proper nutrition is essential for the health, growth, and longevity of tigers. As large carnivores, tigers require a diet rich in muscle, bone, fat, vitamins, and minerals. They must be fed appropriate quantities and supplements that reflect their age, activity level, health status, and physiological needs. According to animal-husbandry guidelines, diets containing high percentages of boneless muscle meat and poultry are generally understood to be nutritionally deficient for tigers.[22]

107.    Malnutrition can cause a wide range of ailments, from digestive disorders to skeletal deformities and immune dysfunction, and the AWA regulations mandate that food be "wholesome, palatable, and free from contamination and of sufficient quantity and nutritive value to maintain all animals in good health." 9 C.F.R. § 3.129(a). Kirshner has repeatedly failed to meet this standard, with USDA inspectors often documenting violations related to food safety and nutritional quality.

108.    Violations related to food safety include meat left unrefrigerated for extended periods, moldy produce, open bags of animal feed exposed to contaminants, signs of rodent infestations in food storage areas, and proximity of food to toxic chemicals such as bleach and paint. Preparation areas were, during past inspections, found to be unsanitary, with worn surfaces, rusty tools, and spoiled food remnants.

109.    As for nutritive value, among the numerous victims of Kirshner's neglect in this regard is Shyra, a young tiger born at Kirshner in June 2023 who developed MBD—a painful and debilitating condition caused by calcium deficiency and lack of proper supplementation. In January 2024, USDA inspectors observed Shyra struggling to move and exhibiting signs of discomfort and

---

[22]    Global Federation of Animal Sanctuaries, *Standards for Felid Sanctuaries*, § N-2.m.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

weakness during numerous inspections. It was ultimately confirmed she was suffering from multiple bone fractures, a symptom of MBD. The inspectors found that Kirshner failed to provide adequate supplements for Shyra's diet, administering as little as 0–2 grams of nutritional supplements per meal instead of the required 18–27 grams. Worse still, the supplements were expired, and Kirshner maintained no records of the ratios of bone to muscle meat or dosages of supplements.

110.    Despite Shyra's visible suffering, Kirshner failed to follow veterinary guidance. In February 2024, the USDA found that Shyra's condition was likely painful and had progressed due to neglect, and in June 2024 USDA inspectors issued Kirshner an Official Warning in connection with Shyra's malnutrition.

111.    Moreover, many of Kirshner's malnourished tigers are at the same time overweight and in some cases obese, a condition that exacerbates heat sensitivity, causes joint pain, and increases the likelihood of arthritis. USDA inspectors noted that overweight tigers at Kirshner exhibited labored breathing and discomfort during hot weather.

112.    Malnutrition and obesity both impede a tiger's ability to move, play, and rest comfortably, disrupting essential behaviors and causing suffering. Chronic nutritional neglect at Kirshner not only harms and harasses these tigers, it has—on information and belief—killed multiple tigers at Kirshner.

### c.  *Kirshner harms, harasses, and—on information and belief—has killed tigers by denying them sanitary conditions.*

113.    Tigers, like other animals that rely on olfactory cues, are sensitive to unsanitary environments, which—for scent-oriented animals—are akin to "being in a room where there is constantly white noise being amplified." *See Sellner*, 161 F. Supp. at 703.

114.    In addition to interfering with natural behaviors like grooming, resting, and scent-marking, exposure to unsanitary environmental conditions—including contaminated food, water, and substrates—leads to severe health problems and causes infection, gastrointestinal distress, parasitic exposure, respiratory illness, and a host of other diseases.

115.    USDA inspection records reveal pervasive sanitation failures affecting Kirshner's

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

tigers. One report documented two tigers held in a lockout area filled with standing water, rotting food, a dirty water container, and puddles that soaked their paws. A stick was used to clean feces from the area because there was no alternate entrance.

116.    Other violations include standing water containers filled with decaying organic matter and aquatic insects, meat left unrefrigerated, and unclean feeding surfaces. Food was prepared using rusty cutting tools and served on planks that were inadequately sanitized between feedings.

117.    Food storage areas were littered with open and spilled bags of feed, exposed to rodent bait and chemicals and cluttered with accumulated debris. Evidence of rodent infestation was observed in food storage areas. Food cleaning receptacles, bowls, and crates were left dirty, with rainwater and decomposing organic material.

118.    Moreover, on information and belief, Kirshner has covered up contaminated substrate in the tigers' enclosures with fresh layers of substrate rather than removing the contaminated material. Algae growth and layered contamination were visible in photos from numerous site visits over several years.

119.    These unsanitary conditions injure tigers both physically and psychologically. They cause skin disease, bacterial infections, and chronic distress. With no safe and sanitary place to rest, eat, play, exercise, or escape contamination, the tigers are robbed of the ability to engage in normal, species-typical behavior.

120.    Kirshner's pattern of neglect subjects the tigers in its care to constant, preventable suffering, violates USDA regulations, falls far short of accepted husbandry practices, and has directly caused injury. Accordingly, Kirshner's failure to provide clean living conditions harms, harasses, and has—on information and belief—killed tigers confined at Kirshner's ramshackle property.

### d.  Kirshner harms, harasses, and—on information and belief—has killed tigers by denying them safe and appropriate housing.

121.    Tigers need space to roam, structures for privacy and thermoregulation, and enclosures free of hazards. According to AZA and other animal-husbandry guidelines, solitary adult

tigers should be provided with at least 1,200 square feet of outdoor space, secure fencing, and safe environmental features.

122.   Kirshner provides a fraction of the appropriate space. On information and belief, tigers are confined to cages roughly 20 by 20 feet—just 400 square feet. These spaces are inadequate for normal movement, rest, play, and other species-typical behaviors. Indeed, the tigers at Kirshner can't even walk more than a few paces before reaching the fence.

123.   USDA inspectors have repeatedly cited Kirshner for unsafe housing conditions. These include noncompliant perimeter fences, nearby objects that reduce the effective height of barriers, and leaning panels, decks, and ladders near enclosures—all of which create a likelihood of injury and escape.

124.   Kirshner has also been cited for dilapidated den boxes with splintered wood and exposed screws, creating a likelihood of laceration, infection, and entrapment. During another inspection, shredded tarps were observed hanging into tiger enclosures, creating a likelihood of injury from ingestion.

125.   The tigers at Kirshner suffer in extreme temperatures without adequate cooling mechanisms. During inspection, tigers were observed exhibiting signs of overheating in triple-digit temperatures, panting heavily without fans, pools, frozen treats, or adequate shade. USDA inspectors concluded that Kirshner's facility failed to provide the tigers with any adequate means of thermoregulation.

126.   These conditions deprive tigers of comfort, safety, and the ability to engage in basic species-typical behaviors. Roaming, hiding, resting, and regulating body temperature are essential to a tiger's health. By denying these opportunities, Kirshner harms and harasses its tigers and, on information and belief, has killed tigers by subjecting them to prolonged exposure to such conditions.

###### e. *Kirshner harms, harasses, and—on information and belief—has killed tigers by facilitating inappropriate contact with the public.*

127.   Direct contact between tigers and the public is inherently dangerous and contrary to basic animal-welfare standards. It causes psychological distress, exposes animals to disease, and

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

can result in physical injury. USDA regulations prohibit such contact without proper barriers, and AZA guidelines strongly oppose it. Physical contact between tigers and the public is not only universally discouraged, it is—as of December 2022—illegal under the Big Cat Public Safety Act. *See* 16 U.S.C. § 3372(e)(2).

128.    Despite overwhelming authority discouraging contact between tigers and humans, Kirshner has permitted members of the public to bottle-feed cubs, hand-feed adult tigers, and even walk tigers on leashes. The facility has, in the past, posted advertisements promoting photo opportunities with tiger cubs and charged money for such activities.

129.    Photos from the Butte County Department of Public Health show tiger cubs being handled by members of the public inside vehicles and homes—conditions that violate welfare and safety standards and create a high likelihood of severe distress, physical injury, and escape for the tigers involved, as well as a risk of injury to members of the public present for such interactions.

130.    Kirshner's tigers have also been transported to public events and confined for long periods in small cages, displayed at casinos, hospitals, and festivals under loud and chaotic conditions. During these events, the tigers had no place to retreat, hide, or rest.

131.    Even the signage at Kirshner's facility acknowledges the stress caused by public interaction. Outside Zuri and Savara's enclosures, Kirshner posted a sign that read: "[She] is a sensitive cat and can get upset easily. If she is agitated, please walk away so that she can calm down." Yet Kirshner still chose to expose the tigers to constant public interaction.

132.    As courts have recognized, forced public contact constitutes harassment and harms big cats by inducing stress that disrupts normal behavior and causes lasting psychological damage. *See, e.g.*, *PETA v. Wildlife in Need and Wildlife in Deed*, 476 F. Supp. 3d 765, 784 (S.D. Ind. 2020). On information and belief, Kirshner's tigers have suffered both immediate and chronic physical and psychological injury due to these practices.

133.    These violations are part of a longstanding pattern of conduct by Kirshner that harms, harasses, and—on information and belief—has killed tigers.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

*f.  **Kirshner harms, harasses, and—on information and belief—has killed tigers by denying them adequate veterinary care.***

134.    Regular veterinary care is critical to ensuring that injuries and illnesses are promptly identified, treated, and managed. It is also a required practice under the AWA regulations. *See* 9 C.F.R. § 2.40.

135.    Kirshner has demonstrated a systemic failure to provide its tigers with timely, appropriate veterinary attention. Shyra, for example, showed progressive weakness and immobility due to MBD. Despite clear symptoms, Kirshner failed to follow veterinarian instructions on bedding, movement restriction, and nutrition.

136.    Inspections found that Shyra was still confined in an unsafe space with fleece blankets and a shredded pillow, despite having been explicitly warned about these items. Shyra's painful condition was allowed to progress unchecked at Kirshner's facility until she was finally confiscated by the CDFW in 2024.

137.    The USDA cited Kirshner for similar neglect after another tiger, Dana, was found by inspectors to have an apparently painful eye condition involving a protruding third eyelid, discharge, and facial staining. The inspector noted Dana had not been evaluated or treated by a veterinarian.

138.    The denial of veterinary care causes unnecessary suffering, delays recovery, and allows otherwise treatable conditions to worsen. These practices constitute harm and harassment under the ESA.

139.    By ignoring the instructions of veterinary professionals and failing to intervene in a timely manner, Kirshner not only harms and harasses individual tigers, but also has created a likelihood of broader suffering and further psychological and physical injury by confining healthy tigers in close proximity to tigers and other animals with potentially communicable, untreated conditions.

140.    The absence of veterinary care has directly injured several tigers at Kirshner, including Shyra and Dana, and created a likelihood of further injury by disrupting the tigers' ability to engage in normal behavioral patterns and causing exposure to pathogens and disease from sick

and ailing animals left to languish without medical attention. On information and belief, these conditions have killed tigers who died at Kirshner without receiving adequate veterinary care. These failures constitute an unlawful take in violation of the ESA.

### iii. Defendants take lions in violation of the ESA.

#### a. *Kirshner harms, harasses, and—on information and belief—has killed lions by denying them proper social groupings and adequate environmental enrichment*

141.    Lions are among the most social big cats, naturally forming complex social structures known as prides. In the wild, lion prides are composed of related adult females and their young, and typically one to several males. Social interaction is critical to lions' development, cognitive stimulation, and emotional well-being. Female lions form strong bonds with mothers, sisters, and daughters, remaining in their natal pride for life.

142.    In addition to social bonds, captive lions require large and enriched environments that mimic the complexity of their natural habitats. In the wild, lions spend significant time moving, playing, hunting, and engaging in social behaviors. They need space to roam, shade, structures to climb and hide, and stimulation to express their species-typical behaviors.

143.    In order to allow the expression of species-typical behavior and prevent physical and psychological injury, it is recommended that lions be housed in "large spacious enclosures designed to encourage species-appropriate behaviors such as resting, walking, hunting, stalking, grooming, playing, breeding, etc." Association of Zoos and Aquariums, Lion Care Manual (2012) at 18. Proper enclosures include varied terrain, visual barriers, enrichment items, and opportunities to retreat.

144.    Kirshner denies its lions both proper social grouping and adequate enrichment. On information and belief, lions at Kirshner—including Lucie, Leyah, Samson, and Amari—have been housed in solitary or inappropriate pairings. Amari, a lioness with facial paralysis, was housed not with other lions but with a leopard named Axle, who Kirshner has publicly described as Amari's "service animal."

145.    The denial of appropriate and necessary social interaction—especially for highly social female lions like Lucie and Leyah—causes severe psychological and physical manifestations

of acute and chronic distress. Lions denied companionship suffer constant anxiety, exhibit stereotypic behaviors like pacing, and experience compromised immune function.

146.    Kirshner's barren, cramped enclosures are on information and belief, no larger than 20 by 20 feet—far below AZA minimum standards, which consider 10,000 square feet the minimum appropriate space for new lion exhibits. Kirshner's cages lack natural foliage, climbing structures, enrichment items, and water features.

147.    Kirshner's lions are deprived of necessary environmental enrichment and denied outlets for physical and psychological stimulation. Photos and videos from site visits show lions pacing while confined in tiny cages containing only a den box or small platform. According to eyewitnesses, the lions sometimes pace for hours at a time.

148.    These conditions violate basic animal-husbandry standards and cause lions to suffer harm and harassment under the ESA. As the court in *PETA v. Lowe* found, failing to provide animals with environmental complexity and companionship inflicts both acute and chronic harm and constitutes a prohibited take. *See* No. CIV-21-0671-F, ECF No. 483 ¶¶ 16 (Findings of Fact), 11-12 (Conclusion of Law).

149.    Kirshner's practice of confining lions to these structurally inadequate, isolating, barren enclosures, devoid of enrichment objects and opportunities for exercise, harms and harasses them by causing physical and psychological injuries, including psychological distress and other conditions that create a likelihood of further injury by disrupting the lions' ability to engage in normal behavioral patterns, and—on information and belief—has killed lions.

### b. Kirshner harms, harasses, and—on information and belief—has killed lions by denying them adequate nutrition.

150.    Lions require nutritionally balanced diets with appropriate levels of calcium, phosphorus, vitamins, and other nutrients to support their musculoskeletal systems and immune function. The AWA regulations mandate that animal food be "wholesome, palatable, and free from contamination and of sufficient quantity and nutritive value to maintain [the lions] in good health." 9 C.F.R. § 3.129(a). According to animal-husbandry guidelines, diets containing high percentages of boneless muscle meat and poultry are generally understood to be nutritionally deficient for

lions.[23]

151.    Inadequate nutrition for lions leads to severe chronic conditions, including MBD, neural dysfunction, poor metabolism and weight issues, suppressed immune system, poor skin/coat/nail structure and quality, and ocular degeneration and impairment.[24]

152.    Kirshner has been cited eleven times by the USDA for failing to provide adequate nutrition for big cats, including lions. Nine of these citations involved confirmed or suspected cases of MBD, a deadly condition caused by calcium deficiency.

153.    One lion cub, Lucie, suffered from intermittent lameness and was fed mainly boneless muscle meat without adequate calcium supplementation. The nutritional supplements at Kirshner's facility were not labeled or properly stored. USDA inspectors found no documentation of feeding protocols or adequate veterinary involvement in Lucie's diet.

154.    Despite clear signs of MBD, including difficulty standing, and crawling instead of walking, Kirshner failed to consult a veterinarian with experience in big cat nutrition. Even after being instructed by USDA's Animal Plant Health Inspection Service ("APHIS") to seek expert guidance, Kirshner did not follow through.

155.    USDA reports show that Lucie was given only 30 grams of calcium supplementation daily—less than a third of the required 100 grams. She continued to suffer and decline over multiple USDA inspections.

156.    It has been common for lions at Kirshner to exhibit persistent physical and neurological signs of malnutrition. Specifically, Lucie, Samson, and Leyah have all exhibited some combination of MBD, neural dysfunction, obesity, and blindness.

157.    Despite USDA findings directly linking their symptoms to malnutrition, Kirshner's website made conflicting claims about Lucie and Samson's conditions, attributing them to head trauma or congenital disorders.[25]

---

[23]    Global Federation of Animal Sanctuaries, *Standards for Felid Sanctuaries*, § N-2.m.

[24]    *See* Expert Report of Jay Pratte, *PETA v. Wildlife in Need and Wildlife in Deed*, No. 4:17-cv-00186-RLY-DML, Exhibit 7 to ECF No. 317-1, ¶ 212 (S.D. Ind. Apr. 24, 2020).

[25]    Kirshner, SAMSON – AFRICAN LION, www.kirshner.org, https://www.kirshner.org/samson-african-lion (archived at https://web.archive.org/web/20250323065837/https://www.kirshner.org/samson-african-lion) (last

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

158.   An example of the poor body condition of Kirshner's lions caused by Kirshner's provision of an inadequate diet is shown below, as well as in the attached **Exhibit 8**:



Lion Samson in a tiny, barren enclosure with protruding fat deposits, January 26, 2019

159.   Moreover, two lion cubs, Ani and Northgate, died prematurely under Kirshner's care. Photos of Northgate showed bowed legs and limb deformities typical of MBD before her death.

160.   These failures violate the AWA and constitute harm and harassment under the ESA. Malnutrition hinders lions' growth, immune response, and quality of life, creating a likelihood of further physical and psychological injury by disrupting normal behavioral patterns, and, on information and belief, has killed lions at Kirshner.

> **c.   Kirshner harms, harasses, and, on information and belief, has killed lions by denying them safe and appropriate housing.**

161.   Lions require spacious, secure, and hazard-free enclosures. They must be protected from extreme weather, have areas for rest and retreat, and be housed in environments free of dangerous surfaces and ingestible objects.

---

visited June 3, 2025), LUCIE THE LION, www.kirshner.org, https://www.kirshner.org/lucie-the-lion (archived at https://web.archive.org/web/20250322221408/https://www.kirshner.org/lucie-the-lion) (last visited June 3, 2025).

162.   Kirshner has failed to meet these basic standards, instead confining lions in dilapidated unsafe, deteriorating, enclosures that are unfit to meet the lions' physical and behavioral needs. Moreover, the lion enclosures fail to provide adequate protection from environmental hazards, including extreme heat; contain affirmatively dangerous objects and surfaces; and do not meet basic standards for space, security, or shelter.

163.   USDA inspectors have cited Kirshner multiple times for housing-related violations involving the lions. These citations include failure to repair damaged enclosure infrastructure, failure to prevent access to hazardous materials, and failure to provide sufficient protection from the elements.

164.   Specifically, the lions' enclosures offer little insulation or relief from the Central Valley's extreme heat. During inspections, lions were documented to be panting heavily in their exposed cages with no meaningful access to shade or cooling measures. On multiple occasions, Kirshner was cited for failing to implement temperature regulation protocols despite triple-digit temperatures. On one day when the temperature reached 106 degrees, the lions had no fans, pools, misters, or shade. Surfaces in the enclosures exceeded 127 degrees, posing an immediate threat to the animals' well-being. USDA records from 2022 and 2023 show repeated noncompliance and inaction, even after animals were observed in visible distress struggling to breathe during heat waves where temperatures reached well over 100 degrees.

165.   The USDA also cited Kirshner on two separate occasions for failing to maintain enclosures in acceptable conditions, finding that den boxes for big cats had damage to the exterior surfaces, leaving large protruding wood splinters, exposed screws, and holes, thereby creating a likelihood of injury and entrapment. Eyewitnesses have observed lions chewing on pieces of splintered wood, and tattered tarps and cloth coverings have been seen hanging into the lions' enclosures.

166.   The enclosures are also unfit to safely contain the lions, creating a likelihood of escape and posing serious safety risks not only for the lions, but also for members of the public and for Kirshner's operators and volunteers themselves. For example, Kirshner has been cited for unsafe perimeter fencing, including leaning objects that reduce fence height surrounding the

enclosures of large carnivores and increase escape risk. Eyewitnesses also have reported that some lions were, in the past, confined to horse trailers or kept inside Ms. Kirshner's house and garage.

167.    Chronic confinement in structurally deficient, hazardous housing without adequate climate controls or physical barriers interferes with basic activities like rest, free movement, and thermoregulation. These housing conditions harm and harass lions by causing physical injury and chronic and acute distress, and by impairing the expression of species-typical daily activities and behavioral patterns. On information and belief, these deplorable conditions have also killed lions at Kirshner's facility.

### d.    Kirshner harms, harasses, and—on information and belief—has killed lions by denying them sanitary conditions.

168.    Lions require clean, sanitary environments to maintain their physical health, prevent disease, and support natural behaviors. These apex predators rely heavily on their olfactory systems to navigate their space, communicate with other lions, and mark territory. When their environments are overrun with filth, their ability to engage in species-typical behavior is disrupted. Unsanitary conditions also cause exposure to bacteria, parasites, and airborne pathogens, which lead to illness, respiratory distress, and psychological harm from prolonged exposure to contaminants and sensory overload.

169.    Lions at Kirshner, like the other animals confined at its squalid and chronically neglected compound, are denied basic sanitation. USDA reports reveal that Kirshner has been cited repeatedly for failing to provide a clean environment. For example, the USDA found that Kirshner failed to discard containers of standing water, which were observed to be very dark in color, putrid smelling, and filled with aquatic insects; left out non-frozen meat without refrigeration for over an hour; allowed food to mold and deteriorate; served food on wooden planks that were not adequately cleaned; stored food next to bleach, paint, bags of cement, and car batteries; and left meat juice to pool inside freezers where food was stored, among other things.

170.    Beyond the obvious health hazards, these conditions create chronic and acute distress and sensory disorientation, which interfere with the lions' ability to engage in species-typical behaviors, thereby creating a likelihood of further physical and psychological injury. As

recognized by numerous federal district courts, sanitation deficiencies in food storage and preparation areas and in areas surrounding their enclosures cause injury to lions, including via exposure to pathogens from spoiled/contaminated food and pathogen-carrying insects and rodents. *See, e.g.*, *Tri-State*, 424 F. Supp. 3d at 408-12 (facility-wide sanitation problems established in part that Defendants violated the ESA with respect to Listed Species at its facility); *Sellner*, 161 F. Supp. 3d at 700-01 (unsanitary conditions surrounding or in close proximity to the enclosures of Listed Species, general lack of cleanliness throughout the facility, and exhibitors' apparent inability to "keep up with the demands of providing clean water and sanitary conditions" for all of its animals, including the Listed Species, established a taking under the ESA with respect to Listed Species at the facility).

171.    By confining lions in unsanitary environments and exposing them to contaminated surfaces and hazardous materials, Kirshner harms and harasses lions by causing them physical and psychological injury, interfering with essential behaviors (thereby creating a likelihood of further injury), and, on information and belief, has killed lions in violation of the ESA.

### e.  *Kirshner harms, harasses, and, on information and belief, has killed lions by denying them adequate veterinary care.*

172.    Timely, consistent, and adequate veterinary care is essential for diagnosing and treating injury and illness, managing medical conditions, limiting disease progression, and safeguarding lions' capacity to engage in species-typical behaviors. Denial of timely and professional medical intervention causes untreated injuries to fester, allows chronic conditions to progress, leads to outbreaks of communicable disease, and subjects lions to needless suffering. Under the ESA, this denial constitutes both harm and harassment.

173.    Kirshner has a documented and longstanding history of depriving lions of even rudimentary veterinary care. USDA inspectors cited the facility as recently as February 2024 for failing to notify an attending veterinarian about an open facial wound on a lion named Leyah—an injury that was both untreated and unreported to the attending veterinarian. Visitors documented similar untreated wounds on Leyah's body between 2018 and 2022, indicating a chronic pattern of neglect.

174.    Multiple lions at Kirshner—including Lucie and Samson—exhibit clear symptoms of MBD, a condition that causes chronic pain, limb deformities, fractures, impaired mobility, and—if left untreated—ultimately death. These conditions are diet-related and require prompt diagnosis and treatment by a veterinarian with specialized knowledge of big cat nutrition. Yet even after the USDA explicitly directed Kirshner to consult such a specialist regarding Lucie's deteriorating condition, Kirshner failed to do so.

175.    Indeed, the epidemic of MBD at Kirshner's facility is linked to Kirshner's failure to implement a proper nutritional plan—a failure compounded by its refusal to involve competent veterinary professionals with requisite expertise in big cat nutrition. As a result, lions at Kirshner have suffered visible signs of malnutrition and injury for years, including misshapen limbs, obesity, abnormal gait, and apparent physical discomfort. Former volunteers reported that Defendant Roberta Kirshner actively bypassed veterinary oversight, instead soliciting human medications from volunteers—including morphine, B12 shots, and marijuana—for use on lions. Specifically, Ms. Kirshner reportedly dosed a lion named Mala with marijuana and asked volunteers to obtain personal medications for Samson rather than seeking appropriate treatment from an experienced veterinarian and addressing the underlying cause of his chronic pain—likely MBD caused by chronic malnutrition.

176.    Kirshner's systematic refusal to provide appropriate veterinary care and its substitution of illicit, unprescribed, and unmonitored substances in place of professional treatment causes direct physical and psychological injury and prolonged suffering. These actions harass and harm the lions by causing physical and psychological injury, and create a likelihood of further injury by disrupting their ability to function, move, and engage in normal behavioral patterns. On information and belief, these failures have also killed multiple lions under Kirshner's care.

### f.    Kirshner harms, harasses, and—on information and belief—has killed lions by failing to maintain adequate barriers and subjecting them to inappropriate public contact and physical abuse.

177.    Lions are apex predators with immense physical strength and complex behavioral needs that are fundamentally incompatible with public handling. Close contact with the public

causes stress, fear, and potential injury to captive lions. Additionally, as of December 2022, physical contact between lions and the public is illegal under the Big Cat Public Safety Act. *See* 16 U.S.C. § 3372(e)(2).

178. Kirshner has failed to provide its lions with adequate barriers from unwanted and inappropriate human contact, including from its own staff and volunteers. In the past, Kirshner has promoted, facilitated, and profited from forcing lions to interact with the public—exposing them to reckless public handling, unsafe husbandry practices, and even direct physical abuse, causing the lions physical injury, psychological harm, and a substantial risk of further injury. This conduct constitutes harm and harassment under the ESA.

179. As USDA inspection records and extensive documentation from former volunteers, visitors, and local officials confirm, Kirshner has facilitated repeated and dangerous interactions between lions and the public. In one such incident, a USDA inspector observed a lion cub named Atlas being handled by a member of the public on an open porch. The cub was lifted off the ground by his chest, without any harness or leash, visibly struggling to escape while standing near an open gate. The inspector explicitly noted that Atlas was large and strong enough to harm or escape from a member of the public—placing both the animal and the public at imminent risk.

180. Kirshner has long permitted the public to walk, hold, play with, and enter enclosures containing lions. Such contact is inherently dangerous for the lions, the public, and Kirshner's own staff and volunteers, and causes lions acute and chronic distress, and suppresses normal behavioral patterns in a manner that creates a likelihood of further physical and psychological injury to the lions.

181. Former volunteers reported that Kirshner staff, including Ms. Kirshner, used physically abusive methods to control lions' behavior. Samson, for example, was reportedly struck with a broom to encourage him to use his legs while he suffered from likely MBD.

182. In a particularly egregious case, Kirshner forced a lion—believed to be Samson—to participate in a public photoshoot while visibly injured. Internal correspondence from the CDFW confirms that Kirshner was fined by the USDA for issues related to this incident, which involved profiting from photo sessions while exhibiting an injured lion.

183.    This pattern of abuse—both physical and psychological—constitutes textbook harm and harassment under the ESA. It significantly disrupts the lions' normal behavioral patterns, deprives them of the ability to engage in species-typical behaviors, and causes lasting physical and psychological trauma. On information and belief, this misconduct also has killed lions confined at Kirshner's facility.

### iv.  Defendants take lion/tiger hybrids in violation of the ESA.

#### a.  Kirshner harms, harasses, and—on information and belief—has killed lion/tiger hybrids by denying them adequate environmental enrichment.

184.    Lion/tiger hybrids, like all big cats, require complex environments that allow them to express natural behaviors, including exploration, play, climbing, stalking, submersion, retreat, and rest in shaded or elevated areas. Denying them this essential environmental enrichment not only causes frustration and boredom, but leads to chronic distress, physical injury, and stereotypic behaviors such as pacing and self-mutilation.

185.    Kirshner houses its lion/tiger hybrids in small, barren cages that, on information and belief, measure no more than 20 feet long by 20 feet wide. These enclosures lack virtually all elements essential to a minimally adequate captive habitat: no natural foliage, no topographical variation, no elevated platforms, no den spaces other than a small wooden box, no pools adequate for cooling, and no species-appropriate enrichment items to stimulate their minds and bodies. The hybrid enclosures are compact dirt-surfaced, exposed pens where they are left to suffer from extreme boredom, distress, psychological torment, and exposure to the elements.

186.    As a result of this deprivation, Kirshner's lion/tiger hybrids are denied the ability to exercise, explore, forage, or exhibit normal movement and species-typical behaviors. On information and belief, the hybrids have no opportunity to climb, jump, or hide—behaviors that are innate and essential to their mental and physical health. The absence of these opportunities creates a constant likelihood of further injury from psychological deterioration and physical decline.

187.    Photographs and videos taken during site visits show lion/tiger hybrids exhibiting classic signs of chronic psychological distress, including repetitive pacing and other stereotypic behaviors. Some hybrids are visibly obese—on information and belief, due to severe inactivity

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

compounded by poor nutrition. The stress, confinement, and absence of behavioral outlets impose continuous suffering on these ESA-protected animals.

188. By chronically denying lion/tiger hybrids the enrichment and complexity necessary to maintain even a baseline level of health and psychological well-being, Kirshner causes actual injury and creates a likelihood of further injury via significant behavioral impairment. This ongoing environmental deprivation harms, harasses, and, on information and belief, has killed lion/tiger hybrids confined at Kirshner's facility.

### b. Kirshner harms, harasses, and—on information and belief—has killed lion/tiger hybrids by denying them adequate nutrition.

189. Nutrition is a foundational element of care for ESA-protected lion/tiger hybrids. When diets are improperly formulated, inconsistently delivered, or not tailored to the physiological needs of these animals, the resulting malnutrition leads to chronic illness, deformities, systemic organ stress, and behavioral disturbances. Chronic nutritional deprivation at Kirshner has harmed, harassed, and—on information and belief—killed lion/tiger hybrids.

190. Kirshner has consistently failed to implement an adequate nutritional program for its lion/tiger hybrids. USDA inspection reports have repeatedly documented violations of the most basic food safety standards, including the use of contaminated surfaces for meat preparation, the storage of food next to toxic chemicals, and the presence of moldy, contaminated, and deteriorating food.

191. As with its other endangered big cats, Kirshner has routinely failed to provide the lion/tiger hybrids safe and nutritionally-adequate food, and failed to involve a veterinarian experienced in exotic felid nutrition in implementing nutritional protocols. According to former volunteers, the facility relies on daily food donations rather than designing and implementing nutritional plans to maintain healthy weight and avoid diet-related illnesses such MBD, obesity, and immune dysfunction.

192. The consequences of Kirshner's nutritional neglect are evident in the physical condition of the hybrids themselves. USDA citations describe hybrids exhibiting labored breathing and visible discomfort in warm temperatures due to excess body weight. Photographic evidence

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

and eyewitness accounts reveal repetitive pacing and abnormal behaviors that suggest psychological distress associated with poor body condition and malnutrition.

193.    The USDA has cited Kirshner for feeding practices that violate minimum standards required for animal health. These include not only the unsafe preparation and storage of food, but also the absence of any documented or veterinarian-approved feeding plans. The lion/tiger hybrids, on information and belief, are thereby subjected to injury, illness, and long-term musculoskeletal and organ damage.

194.    By denying the lion/tiger hybrids adequate nutrition, Kirshner causes both physical and psychological injury, and creates a likelihood of further injury by significantly interfering with the hybrids' ability to function and behave normally. The absence of properly implemented nutritional protocols harms, harasses, and has—on information and belief—killed lion/tiger hybrids in Kirshner's custody.

### c. *Kirshner harms, harasses, and—on information and belief—has killed lion/tiger hybrids by denying them sanitary conditions.*

195.    A sanitary environment is essential to prevent the spread of disease, reduce stress, and maintain basic health in captive big cats. Kirshner has repeatedly failed to provide such an environment for the lion/tiger hybrids under its care.

196.    The USDA has cited Kirshner numerous times for sanitation-related violations that apply across the facility, including the hybrid enclosures. As outlined above, USDA inspectors have documented an alarming array of violations. These include insect-infested standing water; the accumulation of meat juice in freezers; unfrozen meat left out for extended periods; decomposing organic matter in feeding receptacles; overgrown vegetation between enclosures and perimeter fences; food storage and preparation areas that were contaminated and in disarray, animals' food stored near hazardous chemicals; rusty, worn implements and unsanitary surfaces used for food preparation; and signs of insect and rodent infestation, among others. Kirshner's sustained refusal to provide basic cleanliness for lion/tiger hybrids reflects Kirshner's culture of indifference to the health and welfare of the Listed Species in its custody.

197.    These conditions have created a likelihood of injury and disease transmission for

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

lion/tiger hybrids for over a decade. Moreover, lion/tiger hybrids, like Kirshner's other animals, are especially vulnerable to infection due to factors like the high rate of untreated, festering wounds and confinement in unsafe and affirmatively dangerous enclosures. The chronic and acute distress caused by these unsanitary conditions further compounds these physical harms.

198.    By forcing lion/tiger hybrids to live in a filthy environment, Kirshner causes both physical and psychological injury and creates a likelihood of further injury to its lion/tiger hybrids by interfering with their ability to engage in essential behaviors such as grooming and resting and by subjecting the hybrids to constant discomfort and agitation. Chronic confinement in such conditions has harmed, harassed, and—on information and belief—killed lion/tiger hybrids in Kirshner's custody.

### d. Kirshner harms, harasses, and, on information and belief, has killed lion/tiger hybrids by denying them safe and appropriate housing.

199.    Appropriately designed housing is critical for the safety and behavioral health of captive lion/tiger hybrids. Lion/tiger hybrids require enclosures that are structurally sound, secure, and designed to meet species-specific behavioral and physiological needs. Housing that falls short of these standards creates a persistent likelihood of injury, psychological distress, escape, and death.

200.    The USDA has repeatedly cited Kirshner for housing violations that endanger both animals and the public. These include perimeter fences that fall below the minimum height requirement for dangerous animals, unsecured objects—such as fence panels, ladders, and decks—leaning against the fencing, and damaged enclosures with sharp points, exposed screws, and structural weaknesses. These failures create a high likelihood of escape, entrapment, and serious injury.

201.    Kirshner's lion/tiger hybrids are confined to small, barren cages that lack spatial complexity, visual barriers, or adequate shelter. These enclosures prevent the expression of necessary natural behaviors—such as climbing, hiding, roaming, and seeking refuge—and instead impose forced idleness and psychological frustration. The denial of such fundamental housing elements injures the lion/tiger hybrids and significantly impairs their behavioral patterns, thereby creating a risk of further injury.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

202.    In addition to unsafe structural conditions, Kirshner has consistently failed to protect its animals from extreme weather. USDA inspection reports confirm that Kirshner's hybrids are frequently housed without adequate cooling measures during heatwaves, creating a likelihood of heat stress, respiratory distress, and death. On information and belief, confinement in inadequate housing and chronic exposure to extreme heat has killed lion/tiger hybrids at Kirshner.

203.    USDA citations detail a consistent refusal to repair hazardous conditions, implement basic safety protocols, provide adequate means of thermoregulation, and comply with longstanding housing-related regulatory directives. This sustained pattern of neglect goes beyond mere regulatory noncompliance; it reflects Kirshner's disregard for the safety and wellbeing of the lion/tiger hybrids and other animals confined at its facility.

204.    Kirshner's refusal to provide structurally sound, behaviorally appropriate, and climate-safe enclosures physically injures lion/tiger hybrids and prevents them from engaging in essential behaviors, thereby creating a risk of further physical and psychological injury. These conditions harm, harass, and have—on information and belief—killed lion/tiger hybrids at Kirshner's facility.

> ### e.  Kirshner harms, harasses, and—on information and belief—has killed lion/tiger hybrids by denying them adequate veterinary care.

205.    Timely and species-appropriate veterinary care is an indispensable requirement for any facility holding ESA-protected lion/tiger hybrids. Untreated wounds, chronic illness, and improper diagnosis result in pain, disease progression, preventable suffering, and death. Kirshner's failure to provide adequate care constitutes harm and harassment, and has—on information and belief—killed lion/tiger hybrids at Kirshner.

206.    For example, in early 2024, USDA inspectors cited Kirshner for failing to provide medical attention to a lion/tiger hybrid named Isaac. Inspectors discovered two untreated, oozing wounds on Isaac's front leg, each approximately three inches long and two inches wide—injuries that had not been reported to the attending veterinarian. The wounds appeared older than volunteer records suggested, indicating not only a failure to seek care, but a failure to even recognize or document the issue.

207.    On information and belief, numerous lion/tiger hybrids at the Kirshner facility have suffered from chronic gait abnormalities—symptoms consistent with MBD. Left untreated, MBD leads to deformed limbs, lameness, lifelong disability, and ultimately, death.

208.    USDA inspection reports and eyewitness accounts confirm that signs of chronic injury and psychological distress in the lion/tiger hybrids—including pacing, lethargy, and labored movement—are often ignored or inadequately addressed at Kirshner. These visible signs of suffering are yet another reflection of Kirshner's systematic failure to implement any structured preventative care.

209.    Kirshner's denial of basic veterinary care causes ESA-protected lion/tiger hybrids to suffer prolonged physical pain, acute and chronic psychological distress, and prolonged medical decline. These failures significantly impair the hybrids' behavioral patterns and create a high likelihood of further injury. Kirshner's failure in this regard harms, harasses, and has—on information and belief—killed numerous lion/tiger hybrids in its care.

> ***f.   Kirshner harms, harasses, and—on information and belief—has killed lion/tiger hybrids by failing to maintain adequate barriers from the public.***

210.    ESA-protected lion/tiger hybrids are inherently dangerous animals who require strict physical separation from the public to protect both human safety and animal welfare. Forced proximity between lion/tiger hybrids and humans causes distress, fear, and injury, especially in the many hybrids already suffering from chronic health issues. Physical contact between big cats and the public is not only universally discouraged, it is—as of December 2022—illegal under the Big Cat Public Safety Act. *See* 16 U.S.C. § 3372(e)(2).

211.    For many years, Kirshner allowed (for a fee) members of the public to make direct physical contact with the big cats confined at its facility, including the lion/tiger hybrids. Photographs and eyewitness accounts document the handling, petting, and photographing of hybrids during on-site exhibitions. These interactions include petting, posing for photographs, and feeding—all without adequate distance or protective barriers.

212.    Forced public handling significantly impairs the physical and psychological wellbeing of big cats. Studies confirm that repeated close proximity to unfamiliar humans causes

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

measurable stress responses in captive felids, disrupting necessary natural behaviors, inducing stereotypic behaviors, and elevating stress levels. Accordingly, courts have found that forcing big cats, such as lion/tiger hybrids, into proximity with the public harms and harasses them in violation of the ESA. *See*, *e.g.*, *Wildlife in Need and Wildlife in Deed*, 476 F. Supp. 3d at 784.

213.    Kirshner's practice of facilitating such contact, often in uncontrolled settings, harms and harasses the lion/tiger hybrids by injuring them physically and psychologically and creating a persistent likelihood of further injury by interrupting their behavioral routines and exposing them to chronic and acute distress and anxiety. Moreover, consistent rough handling and exposure to the public has—on information and belief—ultimately killed lion/tiger hybrids at Kirshner.

**v.  Defendants take leopards in violation of the ESA.**
  ***a.  Kirshner harms, harasses, and—on information and belief—kills leopards by denying them proper social groupings and adequate environmental enrichment.***

214.    In the wild, leopards inhabit a uniquely broad range of environments, including rainforests, deserts, savannas, and mountainous regions. Their success across these diverse habitats is due in part to their reliance on varied terrain, including broken ground and dense vegetation, for hunting, stalking, and taking refuge. Leopards are highly arboreal animals that frequently climb trees to seek safety, rest, and store recently killed prey. They also rely on olfactory communication, using cheek rubbing and scent marking to establish and navigate territories.

215.    To meet their physical and psychological needs in captivity, leopards must be provided with enclosures that facilitate these natural behaviors. Enclosure design should include vegetation for cover, structures for climbing and observation, and sufficient space and complexity to permit exploration, foraging, hiding, and scent marking. Caretakers should minimize stress by refraining from direct handling during feeding and cleaning procedures.

216.    Scientific research shows that leopards housed in enriched environments—featuring pools, logs, trees, stones, hiding areas, and elevated platforms—exhibit fewer stereotypic behaviors and better overall well-being.

217.    Kirshner fails to provide its ESA-protected leopards with either compatible social groupings or suitable enrichment. Leopards at Kirshner are confined to small, barren cages

measuring no more than 20 feet by 20 feet, with no grass, trees, boulders, or structural variation. The enclosures are largely devoid of enrichment items. When Kirshner has provided enrichment, such items—like plastic balls or stumps—fail to meet the leopards' species-specific enrichment needs. The poor physical condition of these items suggests they are rarely rotated or cleaned to ensure novelty and safe usability. As the court found in *PETA v. Lowe*, failing to provide adequate enrichment items, failing to rotate enrichment items, providing enrichment items that are affirmatively dangerous, and failing to monitor the safety and effectiveness of enrichment items that are provided to big cats constitute harassment under the ESA because such actions "all creat[e] a likelihood of injury." *See* No. CIV-21-0671-F, ECF No. 483 ¶¶ 16 (Findings of Fact), 12 (Conclusion of Law).

218.    In one troubling example of inadequate social grouping, Kirshner confined a leopard named Axle in an enclosure with a lion named Amari. According to Kirshner, Axle was Amari's "service animal." This practice not only denies Axle proper social companionship but also places him in constant contact with an incompatible species, contrary to generally accepted animal husbandry standards. By housing Axle—a member of a solitary species—with a female lion, Kirshner forced Axle into constant proximity with a dominant and highly social species. This inappropriate social pairing harmed and harassed Axle by causing him psychological injury, creating a likelihood of physical injury, and inhibiting his ability to exhibit normal behavioral patterns.

219.    Unsurprisingly, as a likely result of the deprivation of adequate social groupings, space, and environmental enrichment, video and photographic evidence from multiple site visits documents leopards at Kirshner engaging in repetitive pacing, growling, and head swinging—clear indicators of psychological distress.

220.    Additionally, on information and belief, because the leopards are confined to cramped, barren cages, where they have no opportunity to run, jump, climb, exercise, or engage in other forms of species-typical movement, at least two leopards, Axle and Tshuma, are overweight and in poor physical condition. Overweight body condition is directly attributable to a lack of exercise and enrichment opportunities.

221.   Overweight body condition causes a host of medical problems in captive leopards, including liver and kidney failure, heart disease, arthritis, respiratory distress, hyperkeratosis, impaired thermoregulation, and increased susceptibility to joint injuries. In one USDA inspection report, a Kirshner leopard was observed panting with open-mouthed breathing—an indication of discomfort and an inability to properly regulate body temperature.

222.   By placing the leopards in incompatible social groupings and denying them the environmental enrichment necessary to prevent physical and psychological injury, Kirshner not only causes psychological and physical injury to the leopards, but also disrupts their normal behavioral patterns in ways that creates a likelihood of further harm.

223.   This chronic denial of appropriate social grouping and adequate enrichment constitutes harm and harassment and has, on information and belief, killed at least two leopards in Kirshner's custody.

### b.   Kirshner harms, harasses, and has—on information and belief—killed leopards by denying them adequate nutrition.

224.   Kirshner fails to provide its ESA-protected leopards with a nutritionally adequate, species-specific diet. This failure constitutes harm and harassment under the ESA by physically and psychologically injuring the leopards and creating a likelihood of further injury by interfering with their ability to maintain healthy body condition and engage in necessary natural behaviors.

225.   The USDA has cited Kirshner numerous times for failing to meet even the most basic nutritional requirements set forth by the AWA. Visitors to Kirshner have documented that leopards' water bowls are routinely empty, low, tipped over, or visibly dirty, denying the leopards access to clean, potable water.

226.   A lack of appropriate nutrition in leopards leads to severe health issues, including MBD, immune suppression, skin and coat degradation, respiratory distress, and obesity. The USDA has observed multiple leopards at Kirshner exhibiting labored breathing and panting—a clear indication of heat distress likely exacerbated by poor physical condition.

227.   Visitors have also observed leopards with visibly poor coat and skin quality, including hair loss and apparent irritation. At least two leopards—Axle and Tshuma—are

overweight, which creates a likelihood of long-term health issues such as joint degeneration, liver disease, and heart complications.

228.    By denying the leopards at Kirshner a properly balanced diet and failing to ensure consistent access to clean water, Kirshner harms and harasses the leopards by causing them physical and psychological injury, and by interfering with their normal behavioral patterns in ways that create a likelihood of further injury. On information and belief, this longstanding failure also has killed leopards in Kirshner's custody.

### c.   Kirshner harms, harasses, and—on information and belief—kills leopards by denying them a sanitary environment.

229.    Kirshner fails to provide the ESA-protected leopards in its care with a clean and sanitary environment. This failure constitutes a prohibited take under the ESA, as it harms and harasses the leopards by causing them physical and psychological injury, exposing them to pathogens and chronic distress, and disrupting their behavioral patterns in a way that creates a likelihood of further harm.

230.    As outlined above, USDA inspectors have repeatedly cited Kirshner for its failure to adhere to even the most basic sanitation standards. The problems identified by these citations include insect-infested standing water; the accumulation of meat juice in freezers; unfrozen meat left out for extended periods; decomposing organic matter in feeding receptacles; overgrown vegetation between enclosures and perimeter fences; food storage and preparation areas that were contaminated and cluttered; animals' food stored near hazardous chemicals; rusty, worn implements and unsanitary surfaces used for food preparation; and signs of insect and rodent infestation.

231.    These unsanitary conditions at Kirshner cause bacterial infection, respiratory illness, parasitic infestation, and a broad array of other preventable diseases. Moreover, given their strong reliance on scent as a primary form of communication, such conditions severely impair the leopards' ability to engage in species-typical behaviors like marking and relying on scent cues.

232.    These persistent and hazardous conditions harm and harass the leopards by causing them physical and psychological injury and interfering with their normal behavioral patterns in

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

ways that create a likelihood of further injury. On information and belief, chronic exposure to such squalid conditions has killed leopards at Kirshner's facility.

### d. Kirshner harms, harasses, and, on information and belief, kills leopards by denying them safe and appropriate housing.

233.    Kirshner confines its ESA-protected leopards in enclosures that are unsafe and inadequate to meet the leopards' basic physical and psychological needs. These conditions amount to harm and harassment under the ESA because they result in actual physical and psychological injury, interfere with the leopards' ability to engage in normal behavioral patterns, and create a significant likelihood of further injury.

234.    In the wild, leopards are solitary and territorial animals that require space and environmental complexity to stalk prey, rest, mark territory, and climb. Their necessary natural behaviors include patrolling large home ranges, often spanning several square miles. In captivity, they must be afforded an enclosure that allows them to engage in these species-typical behaviors, including climbing, retreating from view, moving freely, and regulating body temperature.

235.    On information and belief, the leopards at Kirshner are confined in small cages measuring no more than 20 by 20 feet—just 400 square feet—without appropriate enrichment, natural substrate, shade, pools, or shelter. These enclosures are devoid of necessary complexity and adequate space to exercise, hide, and climb.

236.    The USDA has repeatedly cited Kirshner for its failure to provide adequate shelter and thermoregulation measures during extreme heat. In three separate inspections, the USDA documented that Kirshner failed to implement appropriate cooling protocols for the leopards when temperatures exceeded 100 degrees. In one such report, APHIS inspectors noted that an overweight leopard was visibly distressed and panting with an open mouth, which is indicative of respiratory distress.

237.    The USDA has also cited Kirshner for its failure to repair damaged structures within the leopard enclosures. In one citation, Kirshner was found to have housed a leopard named Tshuma in an enclosure that posed a serious health risk due to the presence of exposed, broken materials that could easily be ingested. Kirshner was also cited for failing to repair structural deficiencies

across its big cat enclosures and for maintaining perimeter fences in a manner that did not adequately protect the animals or the public.

238.    Most alarmingly, in February 2021, a leopard named Royal attacked and injured a volunteer and subsequently escaped from his enclosure. The USDA concluded that this incident occurred because the leopard's enclosure was not equipped with a lockout—a standard safety feature required by professionally accepted animal-husbandry practices. A follow-up inspection in June 2021 confirmed that a longtime volunteer was unable to implement proper protocols due to the lack of appropriate housing infrastructure for the leopard.

239.    Kirshner's failure to comply with basic housing standards harms and harasses the leopards by causing them injury and—on information and belief—death, and by interfering with their ability to engage in species-typical behaviors, thereby creating a likelihood of further psychological and physical injury.

### e. Kirshner harms, harasses, and—on information and belief—has killed leopards by denying them adequate veterinary care.

240.    Leopards are susceptible to numerous health conditions that require timely and professional veterinary intervention, including MBD, obesity-related ailments, respiratory distress, and dermatological issues. Depriving leopards of appropriate diagnosis and treatment for these conditions results in prolonged suffering and increased risk of death.

241.    On information and belief, Kirshner's surviving leopards—Axle, Royal, Amur, and Tshuma—have all exhibited signs of untreated or improperly treated medical issues, including hair loss, inflamed skin, poor body condition, obesity, and open-mouthed panting consistent with respiratory distress.

242.    For example, photographs from multiple site visits depict leopards with visibly raw skin and patchy or missing fur, signs that may indicate chronic skin disease or parasite infestation. These conditions are painful and, without treatment, can lead to infection.

243.    Obesity, as observed in Axle and Tshuma, further exacerbates existing health problems, placing strain on internal organs and joints. Without veterinary intervention, these conditions progress and significantly diminish the leopards' quality of life, leading to further

psychological distress and physical suffering.

244.    According to USDA inspection reports and volunteer accounts, Kirshner has, on numerous occasions, failed to observe or act upon visible signs of illness or distress in the leopards. This includes, on information and belief, failure to consult with a qualified big cat veterinarian, failure to follow prescribed veterinary treatment plans, and the administration of inappropriate or non-prescribed substances in lieu of veterinary treatment.

245.    The USDA has cited Kirshner on multiple occasions between 2014 and 2024 for failures to provide adequate veterinary care to its animals, including leopards. These citations highlight systemic issues with recordkeeping, failure to follow up on symptoms, and unqualified decision-making regarding animal health.

246.    Chronic denial of necessary veterinary care not only causes acute and chronic pain to the affected animals but also disrupts normal behavioral patterns due to physical limitations, distress, and suffering. Leopards suffering from untreated illnesses cannot engage in species-typical behaviors such as climbing, exploring, marking territory, or interacting with their surroundings.

247.    Kirshner's refusal to perform necropsies or maintain veterinary records upon the deaths of leopards further compounds these failures. Necropsies provide definitive cause-of-death diagnoses and help facilities understand and prevent conditions that could affect other animals. As the court in *Tri-State* recognized, necropsies are a basic standard of care, especially when Listed Species are involved. *See* 424 F. Supp. 3d at n. 4. Without necropsies, the causes of death remain unknown, leaving other ESA-protected animals at risk of contracting undiagnosed and untreated medical conditions. A systematic lack of necropsies would, thus, cause further deaths.

248.    On information and belief, at least two leopards have died at Kirshner as a result of Kirshner's chronic failure to provide adequate veterinary care. Kirshner's persistent failure to provide veterinary care to its leopards, as well as its facility-wide failure to perform necropsies harms, harasses, and has—on information and belief—killed leopards.

> **f.   Kirshner harms, harasses, and—on information and belief—has killed leopards by failing to maintain adequate barriers from the public.**

249.    Kirshner harms and harasses the leopards in its care by failing to maintain adequate

boundaries between the leopards and the public. These inadequate safety protocols cause the leopards physical and psychological injury and interrupt their normal behavior in a way that creates a likelihood of further harm.

250.    Leopards, like other captive big cats, are highly sensitive to environmental stressors, including forced human interaction. Inadequate public barriers and forced proximity to people have been shown to decrease activity levels, induce stress and agitation, and impair leopards' psychological wellbeing.

251.    On information and belief, Kirshner routinely allows members of the public to make direct contact with leopards during on-site and off-site exhibitions. Visitors have been permitted to pet, photograph, and interact with leopards at the facility and during public outreach events. These practices not only risk serious injury to the animals and to the public, but also violate professional standards of animal handling and care. Moreover, as of December 2022, physical contact between leopards and the public is illegal under the Big Cat Public Safety Act. *See* 16 U.S.C. § 3372(e)(2).

252.    In addition to on-site interactions, Kirshner has transported leopards to various off-site locations for public exhibition—including television studios—where, on information and belief, the animals are confined for long periods in cramped cages and forced to perform or be handled in front of studio audiences.

253.    Examples of the forced proximity to humans and rough public handling Kirshner's leopards are forced to endure are shown below, as well as in the attached **Exhibits 9-10**:

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1
2
3
4
5
6
7
8
9
10
11

 

Baby leopard being manhandled in small cage offsite during public exhibition at the Durham Harvest Festival, September 16, 2018

12    254.    Kirshner's history of unsafe public contact practices has resulted in documented

13    injury and widespread psychological distress to the leopards. These actions constitute harm and

14    harassment under the ESA by causing actual physical and psychological injury and by disrupting

15    the leopards' ability to retreat and engage in normal behavioral patterns, creating a likelihood of

16    further injury.

17    255.    By denying leopards the ability to remove themselves from stressful situations,

18    Kirshner harms and harasses leopards by exposing them to physically injurious conditions as well

19    as acute and chronic distress, which cause permanent neural and physiological changes that can

20    impair learning, coping mechanisms, and memory function for the remainder of the leopards' lives,

21    thereby causing both immediate and long-term psychological and physiological injury. As the court

22    determined in *PETA v. Wildlife in Need and Wildlife in Deed*, forcing big cat cubs into direct contact

23    with the public harms and harasses the cubs by depriving them of sleep, forcing them to eat in an

24    extremely stressful environment, and subjecting them to public handling and abusive disciplinary

25    measures. Such forced public contact "constitutes harassment because it creates a likelihood of

26    injury" to big cat cubs "by annoying them to such an extent as to significantly disrupt normal

27    behavior patterns. And such conduct harms [them] because it actually injures them." 476 F. Supp.

28    3d at 784.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

256.    Kirshner's failure to maintain safe public barriers and its ongoing facilitation of improper public contact with leopards harms harasses, and has—on information and belief—ultimately killed leopards, which constitutes a prohibited take in violation of the ESA.

### vi.  Defendants have taken snow leopards in violation of the ESA.
#### a.  *Kirshner has harmed, harassed, and—on information and belief—killed snow leopards by depriving them of proper social groupings and environmental enrichment.*

257.    Snow leopards are elusive, solitary felids native to the rugged mountains of Central and South Asia. They are uniquely adapted to cold, high-altitude environments and rely on steep, rocky terrain to hunt, seek refuge, and avoid predators. Their strong forelimbs, remarkable leaping abilities, and agile climbing skills allow them to traverse some of the world's most inaccessible terrain. They rely heavily on scent cues to navigate vast territories and identify and communicate with other individuals.

258.    In captivity, snow leopards require enclosures that reflect these natural conditions, offering varied terrain, climbing opportunities, shaded areas, and species-specific environmental enrichment to support psychological and physical well-being.

259.    Enrichment plans for snow leopards must be designed to encourage species-typical behaviors such as running, jumping, climbing, scent marking, and exploration. Incompatible housing or the absence of enrichment can result in acute psychological distress, abnormal behavior, and chronic suffering.

260.    Kirshner has systematically failed to provide these basic environmental and social conditions. According to a former volunteer, a young snow leopard named Caroline was confined with an incompatible male for weeks. He reportedly attacked her repeatedly and prevented her from eating. Despite visible signs of trauma, Caroline was not separated or examined by a veterinarian. She was later found dead in the enclosure, and, on information and belief, her body was secretly removed from the property in a bag.

261.    Kirshner's enclosures for snow leopards lack the physical features and complexity essential for their welfare. The spaces are devoid of boulders, vegetation, climbing structures, or pools. Leopards confined in such conditions are deprived of virtually all opportunities to engage in

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

their necessary natural behaviors.

262. Unsurprisingly, many of Kirshner's snow leopards have been observed engaging in repetitive, stereotypic behaviors including pacing and excessive vocalizing—strong indicators of psychological distress. Others exhibit mobility issues, such as abnormal gaits and limb weakness, consistent with both physical injury and environmental deprivation.

263. Kirshner's failure to provide adequate enrichment and appropriate social conditions has physically and psychologically injured its snow leopards, significantly disrupted their normal behavioral patterns in a manner that created a likelihood of further injury, and, on information and belief, has led to snow leopard deaths. Accordingly, Kirshner has harmed, harassed, and on information and belief, killed snow leopards in violation of the ESA.

**b. Kirshner has harmed, harassed, and, on information and belief, killed snow leopards by denying them adequate nutrition.**

264. Nutrition is foundational to the health and survival of snow leopards. To comply with the AWA regulations, feeding protocols should include a balanced, species-specific diet with appropriate supplements and consistent access to fresh, clean water. *See* 9 C.F.R. § 3.129(a).

265. Evidently unable or unwilling to satisfy these minimal standards, Kirshner has been causing the diet-related injuries and—on information and belief—deaths of snow leopards for many years. Indeed, USDA inspection reports show that Kirshner has routinely failed to meet the bare minimum standards regarding food safety and nutrition, and has cited Kirshner for providing unsanitary food.

266. USDA inspection reports have documented serious food safety violations, including meat left unrefrigerated, the use of dirty wooden planks for feeding, rusted tools in the food preparation area, and food stored next to hazardous chemicals such as bleach, cement, and rodent poison.

267. An additional health concern related to the diet of Kirshner's snow leopards is body condition and body weight. As a consequence of chronic malnutrition, among other abysmal conditions at Kirshner, numerous snow leopards in Kirshner's custody have been malformed, chronically injured, and in poor body condition. For example, one now-deceased snow leopard

named Frederick, observed repeatedly between 2018 and 2021, appeared underweight, exhibited an abnormal gait, and showed signs of limb weakness—telltale symptoms of malnutrition-induced illness.

268.    In addition to physical symptoms, Frederick and other now-deceased snow leopards at Kirshner exhibited signs of psychological distress—including excessive vocalizing and pawing—a likely result of the suffering caused by chronic malnutrition.

269.    These unsanitary and nutritionally deficient practices have caused numerous snow leopards physical and psychological injury. Moreover, because snow leopards rely heavily on scent cues, the presence of unsanitary food and water in or around their enclosures created a persistent likelihood of—and actually did cause—further injury and death by interfering with the snow leopards' ability to engage in species-typical behaviors like olfactory communication.

270.    By failing to provide the snow leopards with adequate nutrition, Kirshner harmed and harassed the snow leopards by causing them physical and psychological injury, creating a likelihood of further injury by severely inhibiting species-typical activities, and, on information and belief, killed snow leopards in its custody—at least six of whom have died at Kirshner's facility since 2012.

### c.  *Kirshner has harmed, harassed, and—on information and belief—killed snow leopards by denying them a sanitary environment.*

271.    Sanitary conditions are essential for preventing disease and reducing chronic stress in snow leopards. Unsanitary environments expose snow leopards to bacteria, pathogens, and filth that cause suffering and death.

272.    Kirshner has consistently failed to satisfy even the most rudimentary standards of cleanliness for its snow leopard enclosures and food preparation areas. The USDA has cited the facility on multiple occasions for these failures.

273.    Like the other Listed Species at Kirshner, the snow leopards were chronically exposed to filthy conditions, including: standing water containers filled with decaying organic matter and aquatic insects; meat left unrefrigerated; unclean feeding surfaces; food prepared using rusty cutting tools and served on planks that were inadequately cleaned; open and spilled bags of

feed; animal food exposed to rodent bait, chemicals, and other toxic materials; clutter and debris; and evidence of rodent infestation.

274.    These unsanitary conditions injured the snow leopards by exposing them to constant health risks and inhibited their ability to express necessary natural behaviors. Because snow leopards communicate in part through scent, olfactory interference from unsanitary surroundings disrupted their essential social and territorial behaviors and caused chronic and acute distress and behavioral dysfunction.

275.    On information and belief, chronic confinement in unsanitary conditions harmed and harassed Kirshner's snow leopards by injuring them physically and psychologically through exposure to pathogens, parasites, and environmental toxins, resulting in illness, chronic and acute distress, and, on information and belief, death. Accordingly, by failing to maintain a sanitary environment for the snow leopards, Kirshner took at least six snow leopards in violation of the ESA.

### d. Kirshner harmed, harassed, and, on information and belief, killed snow leopards by denying them safe and appropriate housing.

276.    Safe housing for snow leopards must, at a minimum, offer protection from the elements, prevent injury or escape, and provide climate controls adequate for a cold-weather species. Housing must also support species-specific behaviors such as climbing, hiding, stalking, and scent marking—behaviors essential to the physical and psychological health and well-being of this solitary, alpine carnivore.

277.    Kirshner's snow leopards were instead confined for years in delipidated, barren cages without necessary climate controls. Indeed, USDA inspectors have cited Kirshner for broken and protruding materials inside numerous felid enclosures, noting that these enclosures pose a risk of entrapment or injury. Kirshner has also been cited for placing items that could aid in escape against the perimeter fencing surrounding the enclosures of its large carnivores.

278.    Particularly egregious is the facility's refusal—or inability—to implement basic heat mitigation strategies for this cold-climate species. Despite being cited on three separate occasions for this failure, Kirshner continued to confine snow leopards in open, sun-exposed cages

without sufficient shade or cooling during periods of extreme heat. On one occasion, a volunteer reported the death of a snow leopard following exposure to triple-digit temperatures and smoke from surrounding wildfires.

279.    The housing Kirshner provided also prevented snow leopards from engaging in species-typical behaviors. Specifically, the enclosures are barren, cramped, and devoid of the necessary elevation, terrain variation, and hiding opportunities for snow leopards, who are adapted to frigid, high-elevation environments. Without vertical access, complex topography, or adequate temperature controls, these snow leopards were stripped of their ability to exhibit natural behaviors and driven to physical injury and psychological distress.

280.    Kirshner's failure to provide safe and structurally adequate enclosures and inability or refusal to implement even the most basic heat mitigation strategies for its cold-adapted snow leopards caused prolonged suffering and, on information and belief, death. Moreover, because the snow leopard enclosures inhibited the snow leopards' ability to engage in natural behaviors necessary to prevent physical and psychological injury, chronic confinement in such inadequate housing created a likelihood of—and actually caused—further injury by significantly interfering with species-typical activities.

281.    The cumulative stress, chronic frustration, abnormal behaviors, and exposure to dangerous conditions in the snow leopards' enclosures harmed and harassed them by causing injury, significantly impairing their health and behavioral functioning and, on information and belief, killing certain snow leopards.

### e.    Kirshner has harmed, harassed, and, on information and belief, killed snow leopards by denying them adequate veterinary care.

282.    As with all captive wildlife, adequate veterinary care is essential to treating injuries, managing chronic conditions, and preventing disease in snow leopards. Because snow leopards are particularly vulnerable to climate-induced stress, timely and expert medical intervention is especially critical in hot climates.

283.    Kirshner failed to provide its snow leopards with these elements of basic care. USDA citations and observations from site visits corroborate this systematic failure.

284.    Snow leopards at Kirshner have repeatedly been seen exhibiting symptoms of untreated injury and illness: hind limb weakness, abnormal gaits, and chronic pacing. One snow leopard, Frederick, was seen numerous times over a three-year period limping with evident discomfort. On information and belief, another snow leopard died of exposure to smoke inhalation from nearby wildfires.

285.    On information and belief, this pattern of neglect resulted in the deaths of at least six snow leopards in Kirshner's care since 2012—three of whom died within the last three years alone.

286.    Kirshner's chronic failure to meet the basic obligation of providing timely and adequate veterinary care has caused significant suffering via physical and psychological injury, created a likelihood of further injury by disrupting normal behavioral patterns, and, on information and belief, killed snow leopards. Such a failure constitutes harm and harassment under the ESA.

> **f.  Kirshner has harmed, harassed, and, on information and belief, killed snow leopards by failing to maintain adequate barriers and exposing snow leopards to inappropriate public contact.**

287.    Snow leopards are naturally elusive and adapted to isolated environments with minimal exposure to other animals, let alone direct human contact. Forcing them into close, unpredictable contact with members of the public, subjecting them to transportation in unfamiliar conditions, and placing them in foreign environments where they are exposed to a barrage of loud sounds, intense smells, and human handling causes injury because it is fundamentally contrary to their biological and psychological needs.

288.    Kirshner has routinely subjected snow leopards to direct public contact and off-site exhibition—practices that significantly disrupt the snow leopards' behavioral health, causing physical and psychological injury and creating a likelihood of further physical and psychological injury.

289.    For instance, the USDA cited Kirshner after learning that a volunteer transported a young snow leopard offsite to a juvenile detention center for public exhibition, where two staff members were photographed holding the animal. As the USDA explained, the snow leopard was

too large and too mature to be safely handled by members of the public.

290.    Kirshner's failure to maintain appropriate barriers for its snow leopards is yet another example of its fundamentally flawed operational model—one that prioritizes public spectacle over animal welfare.

291.    Kirshner's practice of using snow leopards for hands-on public entertainment and subjecting them to off-site exhibitions, prolonged transport, unfamiliar stimuli, and direct handling fundamentally violated their species-specific needs and inhibited their ability to engage in normal behavioral patterns in a manner that created a likelihood of and ultimately caused further physical and psychological injury and, on information and belief, death. Moreover, physical contact between snow leopards and the public is—as of December 2022—illegal under the Big Cat Public Safety Act. *See* 16 U.S.C. § 3372(e)(2).

292.    In forcing snow leopards into direct contact with the public, Kirshner harmed, harassed, and—on information and belief—killed at least six snow leopards in violation of the ESA.

**vii. Defendants take clouded leopards in violation of the ESA.**
   ***a. Kirshner harms, harasses, and—on information and belief—kills clouded leopards by depriving them of environmental enrichment.***

293.    Clouded leopards are highly specialized felids native to Southeast Asia's dense forests. These animals are adapted to arboreal movement, equipped with flexible joints and strong limbs—allowing them to climb vertically up trees, descend headfirst, and leap between branches. In the wild, they stalk and ambush prey from the trees and rely heavily on their environment for physical stimulation and psychological security.

294.    In captivity, the needs of clouded leopards translate into very specific requirements: large, enriched enclosures with diverse vertical structures, hiding spots, soft substrate, visual barriers, climbing logs, and naturalistic vegetation. The enclosures should also allow retreat from human view and severe weather and provide scent-based and cognitive enrichment to encourage exploration and species-typical marking behavior. Lack of environmental enrichment in captive settings severely impairs the ability of clouded leopards to engage in species-typical behaviors and is both physically and psychologically injurious.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

295.   On information and belief, Kirshner's clouded leopards are confined in barren enclosures lacking virtually all of the necessary features. The enclosures are cramped, without natural foliage, varied terrain, or vertical complexity. They lack appropriate climbing structures and enrichment items, when present at all, are not species-specific and fail to meet the clouded leopards' physical and cognitive needs.

296.   By denying them access to conditions that allow them to engage in species-appropriate environmental enrichment, Kirshner causes substantial physical and psychological injury to its endangered clouded leopards. By failing to meet these basic needs, Kirshner disrupts the clouded leopards' normal behavioral patterns in a manner that creates a likelihood of further injury, and, on information and belief, has caused the deaths of multiple clouded leopards.

297.   Predictably, as observed by visitors and documented in photographic and video evidence, clouded leopards at Kirshner exhibit numerous signs of psychological distress. These include stereotypic behaviors such as pacing, excessive panting, and repetitive movements—behaviors indicative of acute and chronic psychological injury.

298.   Moreover, the physical consequences of Kirshner's failures are apparent. Many clouded leopards at the facility, including Bow—the only surviving clouded leopard—have been documented in poor body condition. Bow is visibly obese, a likely result of a lack of adequate exercise and stimulation. Obesity in felids causes numerous medical complications, including joint damage, reduced thermoregulation, internal organ failure, and premature death.

299.   Kirshner's continued failure to enrich the lives of its clouded leopards causes harm and harassment via prolonged physical and psychological deterioration, injury, and in some cases, on information and belief, has killed clouded leopards.

### b. Kirshner harms, harasses, and, on information and belief, kills clouded leopards by denying them adequate nutrition.

300.   Clouded leopards require species-specific, nutritionally balanced diets to support muscle and bone health, as well as cognitive and immune system function. Despite this requirement, Kirshner fails to implement adequate, veterinarian-approved nutritional protocols for its clouded leopards—a deficiency that causes both physical and psychological injury, interferes

with normal behavioral patterns, and, on information and belief, has killed clouded leopards in Kirshner's custody.

301.   The USDA has repeatedly cited Kirshner for its failure to provide adequate nutrition, noting on one occasion that the facility lacked a documented, veterinarian-approved feeding plan for captive felids. This finding corroborates the accounts of eyewitnesses and former volunteers, who report that Kirshner established a practice of relying on daily food donations to determine what animals would eat on a given day. Moreover, Kirshner failed to maintain records of the animals' dietary intake and supplement regimens.

302.   On information and belief, as a result of these failures, three clouded leopards have died at Kirshner since 2021. The sole surviving clouded leopard, Bow, is obese—a condition associated with chronic metabolic dysfunction, reduced mobility, respiratory distress, and thermoregulation problems. Photos from a May 2024 site visit show Bow visibly overweight and panting in the heat, exhibiting signs of discomfort likely linked to improper diet, lack of opportunity to exercise, and inability to regulate temperature.

303.   Lack of adequate nutrition not only harms clouded leopards physically, but also causes and exacerbates stereotypic behaviors associated with psychological distress. Visitors have documented repeated instances of abnormal repetitive behaviors in Kirshner's clouded leopards, including pacing. The USDA's citations and the visible condition of the clouded leopards confirm that Kirshner has long kept clouded leopards in poor body condition due to nutrition-related failures.

304.   These deficiencies injure clouded leopards physically and psychologically, disrupt their normal behavioral patterns in a manner that creates a likelihood of further physical and psychological injury, and, on information and belief, has killed clouded leopards. Accordingly, Kirshner's longstanding practice of depriving its clouded leopards of adequate nutrition harms, harasses, and—on information and belief—has killed clouded leopards in violation of the ESA.

      *c.*  **Kirshner harms, harasses, and has—on information and belief—killed clouded leopards by denying them safe and appropriate housing.**

305.   Kirshner fails to provide safe and appropriate housing for its ESA-protected clouded

leopards. Inadequate housing causes physical and psychological injury, creates a likelihood of escape, and significantly impairs the clouded leopards' ability to express species-typical behaviors. Such conditions injure Kirshner's only surviving clouded leopard, Bow, and have—on information and belief—killed clouded leopards in Kirshner's custody.

306.   Kirshner has been cited repeatedly by the USDA for housing violations affecting its exotic felids, which included clouded leopards. These violations include failure to maintain proper perimeter fencing, failure to repair enclosure damage (such as exposed screws and wood splinters), and placement of items near perimeter fencing that could allow escape.

307.   The clouded leopards' enclosures provide inadequate protection from extreme heat, and Kirshner has been cited on at least three separate occasions for failing to implement cooling protocols. Clouded leopards have been observed panting, lethargic, and visibly distressed in triple-digit heat with no access to shade or relief.

308.   As a result of these conditions, Kirshner's clouded leopards are unable to thermoregulate effectively or engage in movement, resting, stalking, or climbing—activities essential to their well-being.

309.   These conditions cause injury, interfere with clouded leopards' normal behavioral patterns in a manner that creates a likelihood of further injury, and have—on information and relief—resulted in clouded leopard deaths. As such, by confining clouded leopards in inadequate housing, Kirshner harms, harasses, and—on information and belief—has killed clouded leopards in violation of the ESA.

### d. Kirshner harms, harasses, and—on information and belief—kills clouded leopards by denying them a sanitary environment.

310.   Kirshner confines its clouded leopards in unsanitary, hazardous conditions that harm, harass, and, on information and belief, have killed clouded leopards. This is because these conditions create constant health risks, cause chronic and acute physical and psychological distress and other injury, and create a likelihood of further injury by disrupting normal behavioral patterns.

311.   The USDA has cited Kirshner repeatedly for failing to meet basic sanitation requirements. The facility has left insect-infested water, unrefrigerated meat, dirty feeding surfaces,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

and moldy or deteriorated food in preparation areas. It has stored food next to toxic chemicals and rodent bait, allowed meat juice to accumulate in freezers, and failed to adequately clean food preparation areas. The USDA also found that Kirshner allowed weeds and grass to grow up to knee height in some areas around the animals' enclosures, which could harbor rodents, insects, and other animals that could serve as vectors of disease.

312.    In such conditions, clouded leopards suffer exposure to disease vectors, respiratory irritants, and chronic stress. Clouded leopards, in particular, rely heavily on scent marking and olfactory cues to communicate and orient themselves. When their environments are overrun with filth, their ability to perform necessary natural behaviors is disrupted, causing injury and creating a likelihood of further injury by severely disrupting their normal behavioral patterns.

313.    As recognized by numerous federal courts, chronic exposure to contaminated surfaces, unhygienic food, and unsanitary conditions constitutes a take under the ESA, especially for scent-oriented species like clouded leopards. *See, e.g.*, *Sellner*, 161 F. Supp. 3d at 703; *Tri-State*, 424 F. Supp. 3d at 433.

314.    The unsanitary conditions at Kirshner's facility directly impact the clouded leopards' ability to exhibit normal species-typical behavior and, on information and belief, have caused physical injury, disease, and death from increased exposure to pathogens and chronic distress. Likewise, prevailing conditions such as uncovered poison traps, organic waste, insect and rodent infestation, and dangerous and unsanitary surfaces create a likelihood of physical injury and death if clouded leopards are exposed to them.

315.    Accordingly, Kirshner's ongoing failure to provide the clouded leopards in its custody with a non-injurious and sanitary environment constitutes harm and harassment under the ESA because it physically and psychologically injures them, interrupts their behavioral patterns in a manner that creates a likelihood of additional physical and psychological injury, and, on information and belief, has killed clouded leopards.

### viii. Defendants take cheetahs in violation of the ESA.

#### a. *Kirshner harms, harasses, and has—on information and belief—killed cheetahs by denying them adequate environmental enrichment.*

316.   Kirshner has deprived its ESA-protected cheetahs of the environmental enrichment necessary for their physical and psychological well-being. This failure harms and harasses the cheetahs by causing actual injury and by significantly impairing their ability to engage in necessary natural behaviors, which creates a likelihood of further injury. On information and belief, this deprivation has killed at least one cheetah, Paradise.

317.   Cheetahs are uniquely adapted to high-speed pursuits across open savannahs and grasslands. They rely on expansive territory and natural stimuli to support species-typical behaviors such as sprinting, stalking, and pouncing. In captivity, their enrichment needs include space to run, visual barriers, elevated platforms, novel scents, and sensory stimuli that support hunting behaviors.

318.   Cheetahs at Kirshner, including Paradise and her surviving sister Mema, were confined to a tiny barren enclosure, without opportunities to run, for their entire lives. Such conditions are grossly insufficient for animals whose natural behavior involves high-speed chases over large areas. Their cage lacked natural foliage, appropriate terrain, and species-specific enrichment. Items occasionally provided—such as tree stumps or balls—are not suited to cheetahs' complex needs.

319.   As a result of this barren and restrictive environment, Paradise reportedly engaged in frequent stereotypic pacing prior to her death, a behavior indicative of profound psychological distress. On information and belief, Mema, the surviving cheetah, is overweight and similarly engages in repetitive pacing.

320.   Kirshner's failure to provide adequate enrichment and space necessary for cheetahs to express natural behavior constitutes harm and harassment under the ESA. These conditions have caused actual injury, created a likelihood of further injury by disrupting normal behavioral patterns, and, on information and belief, killed Paradise.

#### b. *On information and belief, Kirshner harms, harasses, and kills cheetahs by denying them adequate nutrition.*

321.   Proper nutrition is essential to the health of cheetahs, supporting skeletal

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

development, immune function, and neurological health. Inadequate diets can result, and under Kirshner's care have resulted, in MBD, neural dysfunction, and chronic pain.

322.    Kirshner's cheetahs—whom Kirshner acquired as young cubs from a known wildlife dealer—were fed a diet so deficient that it contributed to diet-related illnesses, physical deformities, and ultimately, on information and belief, the death of Paradise.

323.    Kirshner's own website admits that Mema arrived with "issues with her front legs," and that both she and her sister, Paradise, had "a vitamin deficiency that affected [their] sight."[26] Kirshner claimed that they "should regain most or all of their sight" under its care. That promise was likely never realized. Paradise died. Mema exhibits visible symptoms of poor nutrition, including lameness and limb deformities, and video evidence shows she limps while pacing. These symptoms strongly suggest the same pattern of malnutrition-related injury.

324.    By failing to provide an adequate diet, Kirshner has physically and psychologically injured its cheetahs, significantly impaired their behavioral patterns, and, on information and belief, killed Paradise. Accordingly, Kirshner's longstanding practice of depriving its exotic felids—including Mema and Paradise—of adequate nutrition harms, harasses, and on information and belief kills cheetahs in violation of the ESA.

### c.    *Kirshner harms harasses, and, on information and belief, kills cheetahs by denying them basic sanitation*

325.    Kirshner confines its ESA-protected cheetahs in unsanitary and unsafe conditions. These conditions harm and harass the cheetahs by causing actual physical and psychological injury and by interfering with their necessary natural behaviors in a way that creates a likelihood of further injury or death.

326.    The USDA has repeatedly cited Kirshner for a wide range of sanitation violations that affect the cheetahs. These conditions severely compromise the cheetahs' health, exposing them to pathogens, parasites, and chronic and acute distress.

327.    Specifically, the unsanitary conditions noted in these citations include failing to

---

[26]    Kirshner, MEMA – CHEETAH, www.kirshner.org, https://www.kirshner.org/mema-cheetah (archived at https://web.archive.org/web/20250322223532/http://kirshner.org:80/mema-cheetah/) (last visited June 3, 2025).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

discard containers of putrid-smelling, insect-infested standing water; allowing grass and weeds—which APHIS inspectors noted "could allow harborage of pests and vermin that could affect the health and well-being of the animals"—to grow to knee height between some enclosures and the perimeter fence; leaving unfrozen meat and moldy, deteriorated food in the food preparation area; using worn surfaces and rusty cutting implements to prepare food; storing food next to rodent bait blocks and chemicals including bleach, paint, bags of cement, and car batteries; allowing meat juice to accumulate in freezers; allowing clutter, trash, broken bags of feed, dust, and debris to accumulate in food storage areas; and leaving dirty food receptacles, crates, and cages to accumulate water and decomposing organic material in the cleaning area.

328.    Chronic exposure to these environmental hazards injured the cheetahs, inhibited their ability to engage in normal behavior in a manner that created a persistent likelihood of further injury, and—on information and belief—ultimately killed at least one cheetah who died in Kirshner's custody. Accordingly, by confining cheetahs in an unsanitary environment, Kirshner harms and harasses—and on information and belief engages in killing of—cheetahs in violation of the ESA.

### d. Kirshner harms, harasses, and has—on information and belief—killed cheetahs by denying them safe and adequate housing.

329.    For cheetahs—who are adapted to a life of high-speed sprints and territorial roaming—space and structural integrity are necessities. Housing that fails to accommodate these essential behaviors causes direct injury and imposes profound psychological distress. Yet Kirshner's cheetah enclosures offer neither of these features.

330.    Instead, Kirshner confined its cheetahs in small, barren cages lacking sufficient length, topographical variation, or natural features, which are grossly inadequate for a species whose welfare depends on the ability to run.

331.    Kirshner's failure to provide appropriate housing further impairs the cheetahs' capacity to engage in species-typical behaviors like stalking, hiding, or seeking refuge, and the lack of opportunity to exercise results in poor body condition and behavioral deterioration.

332.    Kirshner's repeated failure to provide thermoregulation during extreme heat further

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

injures cheetahs and interferes with their normal behavioral patterns. The USDA has cited Kirshner for not implementing any cooling protocols in the cheetahs' enclosures during heat waves, even when temperatures exceeded 100 degrees. Cheetahs confined in metal cages without adequate shade or ventilation experience respiratory distress, dehydration, and heat-induced injury. Indeed, Mema has been observed panting and lethargic under such conditions.

333.    Kirshner's refusal to construct species-appropriate enclosures, provide cooling infrastructure, and repair dangerous conditions undermines every aspect of the cheetahs' wellbeing. These failures harm and harass cheetahs by causing physical and psychological injury, behavioral abnormalities that create a likelihood of further physical and psychological injury, and, on information and belief, cheetah deaths.

**ix. Defendants have taken an ocelot in violation of the ESA.**
### a. *Kirshner harmed, harassed, and—on information and belief—killed an ocelot by depriving her of adequate environmental enrichment.*

334.    Ocelots—including Kirshner's now-deceased ocelot Gabriela—are a species driven by stealth, climbing, scent-marking, and exploration. In their natural habitat, ocelots reside in a range of environments from scrublands to tropical rainforests, but all with one common trait: dense vegetation cover. Deprivation of adequate stimulation and structural complexity is a form of sustained psychological torment.

335.    During her life at Kirshner, Gabriela was confined in a barren cage devoid of trees, natural vegetation, or structures to climb—elements necessary to support her instinctive need for elevation and concealment. Her enclosure, believed to measure no more than 400 square feet, consisted of four walls of metal fencing, offering no shelter, complexity, or refuge from extreme weather.

336.    Moreover, ocelots are arboreal and terrestrial, often climbing trees to rest or hunt, and engaging in behaviors such as scratching logs and scent-marking trails throughout their territories.

337.    Humane and legally compliant captive conditions must allow ocelots to express these natural behaviors. Appropriate environmental enrichment for ocelots should include scratch

logs, climbing structures, hiding spaces, elevated platforms, and dense vegetation or other natural cover. Failure to provide such features in captivity causes ocelots mental and physical injury.

338.    Such was the case for Gabriela, for whom Kirshner failed to provide even the most rudimentary species-specific enrichment. The few items within Gabriela's enclosure were wholly inadequate: a small wooden box and a low stool barely large enough for her to sit upon. These did not permit climbing, resting, or engagement with olfactory cues—fundamental behaviors in wild ocelots. The enclosure lacked natural foliage, trees, elevated platforms of meaningful height, or climbing opportunities, and was therefore insufficient to support any necessary species-typical behavior.

339.    Kirshner's failure to provide Gabriela with a proper environment prevented her from expressing natural behaviors. Lacking outlets for physical and psychological expression, Gabriela developed stereotypic behaviors including repetitive pacing—a hallmark sign of stress-induced psychological decline in captive cats.

340.    These conditions harmed and harassed Gabriela by causing her physical and psychological injury, creating a persistent likelihood of further injury by disrupting her ability to engage in species-typical activities on a daily basis, and—on information and belief—ultimately killed her.

341.    Kirshner harmed, harassed, and, on information and belief, killed Gabriela by failing to maintain sanitary conditions in her enclosure and in the surrounding environment. These conditions caused her direct physical and psychological injury and impaired her normal behaviors in a manner that created a likelihood of further harm.

342.    USDA reports reveal that Kirshner has been cited repeatedly for failing to provide a clean environment. For example, as explained above, the USDA found that Kirshner failed to discard containers of standing water, which was observed to be very dark in color, putrid smelling, and filled with aquatic insects; left out non-frozen meat without refrigeration; allowed food to mold and deteriorate; served food on wooden planks that were not properly cleaned between feedings; stored food next to chemicals including bleach, paint, bags of cement, and car batteries; and left meat juice to pool inside freezers where food was stored.

343.   These unsanitary practices exposed Gabriela to pathogens, bacteria, and environmental toxins, which posed a constant threat to her health and contributed to psychological distress and abnormal behaviors.

344.   By exposing Gabriela to these persistent unsanitary conditions, Kirshner subjected her to chronic illness, psychological distress, abnormal repetitive behaviors, and, on information and belief, death. Because the conditions at Kirshner's facility impaired Gabriela's ability to engage in species-typical behaviors and caused her injury and—on information and belief—death, Kirshner's failure to provide Gabriela a sanitary environment harmed, harassed, and on information and belief killed her in violation of the ESA.

### b. Kirshner harmed, harassed, and—on information and belief—killed an ocelot by denying her a sanitary environment.

345.   Kirshner harmed, harassed, and, on information and belief, killed Gabriela by failing to maintain sanitary conditions in her enclosure and in the surrounding environment. These conditions caused her direct physical and psychological injury and impaired her normal behaviors in a manner that created a likelihood of further harm.

346.   USDA reports reveal that Kirshner has been cited repeatedly for failing to provide a clean environment. For example, as explained above, the USDA found that Kirshner failed to discard containers of standing water, which was observed to be very dark in color, putrid smelling, and filled with aquatic insects; left out non-frozen meat without refrigeration; allowed food to mold and deteriorate; served food on wooden planks that were not properly cleaned between feedings; stored food next to chemicals including bleach, paint, bags of cement, and car batteries; and left meat juice to pool inside freezers where food was stored.

347.   These unsanitary practices exposed Gabriela to pathogens, bacteria, and environmental toxins, which posed a constant threat to her health and contributed to psychological distress and abnormal behaviors.

348.   By exposing Gabriela to these persistent unsanitary conditions, Kirshner subjected her to chronic illness, psychological distress, abnormal repetitive behaviors, and, on information and belief, death. Because the conditions at Kirshner's facility impaired Gabriela's ability to engage

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

in species-typical behaviors and caused her injury and—on information and belief—death, Kirshner's failure to provide Gabriela a sanitary environment harmed, harassed, and on information and belief killed her in violation of the ESA.

### c. Kirshner harmed, harassed, and—on information and belief—killed an ocelot by denying her safe and appropriate housing.

349.    Kirshner failed to provide Gabriela with safe and adequate housing. These housing deficiencies caused physical and psychological injury, interfered with her behavioral patterns, and, on information and belief, ultimately led to her death.

350.    Gabriela was confined to a small, barren enclosure without climbing features, shade, or shelter from extreme weather. Her environment lacked sufficient space or complexity to engage in necessary species-typical behaviors, such as climbing, hiding, or escaping the constant gaze of humans.

351.    The USDA cited Kirshner repeatedly for failing to protect felids like Gabriela from extreme heat. Citations noted the absence of adequately implemented cooling measures during triple-digit temperatures, including the failure to provide adequate water basins or meaningful shade and exposing felids—who were observed panting, lethargic, and in visible discomfort during extreme weather events—to overheating.

352.    Kirshner's inadequate housing—combined with its failure to implement even the most basic safeguards during heatwaves—caused Gabriela physical and psychological injury, significantly disrupted her normal behavioral patterns in a manner that created a likelihood of further physical and psychological injury, and, on information and belief, caused her death. These actions constitute harm, harassment, and on information and belief killing under the ESA.

### B. The Janra Defendants are Engaged in Ongoing and Attempted ESA Violations

353.    On August 16, 2024, Defendant Janra, through its employee Megan Swartz, established Terrific, LLC, a California limited liability company. The Articles of Organization listed Terrific's principal office at 5138 Auburn Boulevard, Sacramento, California, the location of Suzie's Adult Superstore, and its mailing address at 7451 Eastgate Road, Henderson, Nevada, Janra's corporate headquarters.

354.    Less than two months later, on October 15, 2024, amid mounting USDA citations and scrutiny from state regulators, Defendants Roberta Kirshner (acting in her capacity as the Trustee of the Robert A Kirshner Revocable Trust), Sean Castro, and Brian Thomas executed a grant deed transferring the Kirshner property at 4995 Durham-Pentz Road in Oroville, California—including its animal enclosures and operational infrastructure—to Terrific, LLC.

355.    After the transfer, in late 2024, Kirshner announced it would temporarily close to the public for "exciting improvements" to its grounds and facilities. But then, on January 8, 2025, the CDFW formally denied Kirshner's application for renewal of its Restricted Species Permit on the basis of persistent and egregious animal welfare violations. Following the permit denial, in February 2025, the CDFW launched a criminal investigation into Kirshner and ordered that Kirshner's animals, including the Listed Species, be removed from Kirshner's custody and relocated to permitted in-state facilities or transferred out of state.[27]

356.    In early 2025, Janra-affiliated entities began using Kirshner's Oroville address on Durham-Pentz Road in official filings and promotional materials, including public advertisements for animal encounters and facility tours. These entities, including Big Cat Refuge and California Wildlife Refuge, were created, owned, and managed by Defendant Ryan Carlson and other Janra personnel, and appear to have no independent operations beyond serving as legal fronts for a continuation of the same exploitative animal exhibition model carried out by Kirshner.

357.    On January 3, 2025, Defendant Carlson registered Big Cat Refuge in California, listing Janra's Henderson, Nevada headquarters as its principal place of business. On January 7, 2025, Carlson filed a Statement of Information with the California Secretary of State changing Big Cat Refuge's principal place of business to Kirshner's Oroville address. In early 2025, Big Cat Refuge began advertising "guided tours" at that location, previewing the opportunity for members of the public to "get up close and personal" with the animals for a $24 admission fee.

358.    On January 16, 2025, Defendant Carlson submitted a letter to the CDFW regarding

---

[27]    CDFW's enforcement role primarily focuses on the immediate removal and placement of confiscated animals, and the agency has no explicit statutory role in ensuring appropriate long-term placement or preventing subsequent transfers. *See* Cal. Fish & Game Code § 2125.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

the January 8, 2025 denial of Kirshner's application for renewal of its Restricted Species Permit. In the letter, Carlson identifies himself as "purchaser of the animal sanctuary operation of the Barry Kirshner Wildlife Foundation and of the real property at 4995 Durham-Pentz Road" and confirms his intent to continue housing and exhibiting ESA-protected animals on-site.[28] Carlson admitted learning that "Ms. Kirshner's lack of resources had created numerous issues with the proper management of the animals at the facility," but proposed to "hav[e] [his] entity, the non-profit California Wildlife Refuge, Inc., take over and salvage the existing operation and facility."[29]

359.    In an apparent effort to reverse or delay the enforcement actions taken by the CDFW, Carlson proposed two "adjustments" to the agency's determination. In both, he sought to keep the animals on the property, avoid transporting them to safer locations, and resume operations after a nominal leadership change. Specifically, Carlson suggested either: "Barry Kirshner Wildlife Foundation would then continue to operate the facility under a new name . . . [or] California Wildlife Refuge, Inc. [would] directly apply for entirely new USDA and CDFW permits . . . and the existing Foundation would transfer custody of the animals to that new entity once permitted."[30]

360.    The CDFW did not adopt or approve either of Carlson's proposed adjustments, including Carlson's explicit request that "[t]he animals remain on the property[,]"—which would have prevented the animals from being relocated to adequate facilities while Defendants were attempting to work around CDFW's revocation of Kirshner's Restricted Species Permit.[31]

361.    However, in February 2025, before the CDFW began its efforts to confiscate Kirshner's animals, Kirshner transferred its ESA-listed species to other facilities. As part of this process, on February 7, 2025, Kirshner transferred five tigers to a Restricted Species "Shelter" Permit holder named Jacob Markow. As a "shelter" permitholder, Markow is permitted to possess restricted species for "humane," non-commercial purposes, such as providing long-term housing of non-releasable animals. *See* Cal. Code Regs. Tit. 14, § 671.1(b)(10). Because animals held under

---

[28]    *See* Ex. 2.

[29]    *Id*. at 1.

[30]    *Id*. at 1-2.

[31]    *Id*.

"shelter" permits are ostensibly held for non-commercial purposes, shelter permitholders like Markow are not required to obtain USDA exhibitor licenses and are subject to a much lower standard of regulatory scrutiny. However, shelter permitholders are still permitted under California law to exhibit animals, as long as the exhibition is solely for fundraising purposes. *See id*.

362.    A few days later, on February 11, 2025, Joan Gulla, the self-described "Facility Manager" of Kirshner, submitted a letter to the CDFW seeking to appeal the denial of the renewal of Kirshner's Restricted Species Permit. In her letter, Gulla outlined Carlson's central role in ongoing efforts to revive Kirshner's operations, stating that Roberta Kirshner had been "working towards making arrangements for the future of the Foundation. She sold the property to an investor last fall, Mr. Ryan Carlson . . . ."[32] Gulla explained further: "Mr. Carlson's intentions is [*sic*] to eventually put me in place as the licensee and remove Roberta. He had hoped Roberta's license would be renewed so we could easily transition permittees." Please consider renewing the permit for BKWF with Joan Gulla as the permittee under the direction of Ryan Carlson, owner."[33]

363.    On February 25, 2025, longtime Kirshner animal handler and corporate officer Angela Bracco appeared before the Butte County Board of Supervisors, where she outlined Kirshner's plan to reclaim the animals and resume operations under Carlson's name. Specifically, Bracco explained that Kirshner sold the facility to Carlson "in hopes of having more revenue to make improvements," and "offered Fish and Game several viable options" that would allow the animals to be returned to Kirshner's facility under Carlson's legal ownership.[34] Bracco explained that Kirshner had stashed its animals at "six different locations [in] three different states" to avoid CDFW confiscation. She also revealed that, in carrying out these voluntary, self-directed efforts, Kirshner killed yet another animal, stating: "[The animals] are not doing well. They need to come home. We have already lost one." She vowed nonetheless that Kirshner and its successors would "fight harder to bring them back."

---

[32]    *See* Ex. 1.

[33]    *Id*. at 2.

[34]    Butte Cnty. Bd. Of Supervisors, Meeting (Feb. 25, 2025), 00:09:56, 00:11:02, available at https://buttecoca.portal.civicclerk.com/event/446/media.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

364.    On February 26, 2025, Carlson contacted the CDFW yet again—this time to inquire about using the Kirshner facilities under Jacob Markow's existing shelter permit, writing that he had "received multiple inquiries from individuals interested in leasing or utilizing the property for animal-related operations[,]" and asking whether Markow could "add 4995 Durham-Pentz Road as an additional location for the species he is already authorized to care for" (which now included some of the Listed Species formerly housed at Kirshner) under his permit.[35] Carlson claimed the Oroville property "remain[ed] unchanged" since he acquired it from Kirshner, and that the facility "continue[d] to meet all enclosure and safety standards"[36]—a totally meritless assertion for all the reasons discussed above. The CDFW responded on February 28, informing Carlson he would have to apply for a new shelter permit, because the Oroville property and Markow's current shelter facility were in different regions. On March 13, Carlson responded, stating in relevant part: "I also feel that a shelter permit would be the best choice for these animals, but if that's not an option, I'm willing to proceed with the exhibitor permit."[37]

365.    The coordinated efforts described above demonstrate that Janra-operated entities and the related defendants have not merely purchased Kirshner's real property. Rather, they have actively sought to revive and continue Kirshner's unlawful operations—including the public exhibition and private possession of federally-protected animals taken in violation of the ESA—by reusing Kirshner's property, facility infrastructure, animal enclosures, and personnel, despite the fact that Kirshner's authority to possess and exhibit animals was revoked on account of those very same conditions.

366.    As their own public advertising materials and communications with state regulators show, Janra and the related defendants—who have no experience in caring for big cats and other ESA-listed species—intend to continue the same substandard and abusive conditions that led to state intervention at Kirshner in the first place.

367.    On information and belief, Carlson's repeated efforts to gain possession of ESA-

---

[35]    *See* Emails from Ryan Carlson to CDFW (copying Jacob Markow) (Feb. 26, 2025) at 4 (on file with author).

[36]    *Id.*

[37]    *Id.* at 2.

listed species, including animals formerly confined at Kirshner's facility and now in the custody of third parties, are ongoing.

## VI.   DEFENDANTS' ACTIONS HAVE CAUSED AESTHETIC INJURY TO ONE OR MORE OF PETA'S MEMBERS

368.   At least one of PETA's members visited Kirshner's facility on multiple occasions between 2018 and 2023, and personally observed ESA-protected animals exhibiting signs of severe distress, including abnormal repetitive behaviors.

369.   The member(s) further observed that floors across the facility were covered in feces and urine, and described the pungent smell of animal waste emanating from the animals' enclosures facility wide.

370.   The PETA member(s) observed Listed Species displaying clear signs of psychological and physical suffering, including evidence of injury from overheating and—on one occasion—exposure to smoke from nearby wildfires. The PETA member(s) also observed repetitive pacing. Specifically, the PETA member(s) described watching many of the Listed Species "going in a circle" and "walking back and forth" along the fencing of their cages "non-stop." Listed Species were confined to small, barren cages lacking meaningful enrichment or any opportunity to exercise.

371.   Witnessing these animals in this state caused the member(s) profound emotional distress. They were deeply disturbed by the visible suffering and the unnatural, inadequate environments in which these animals were kept.

372.   Because of their strong, long-standing interest in and appreciation for large and exotic felids—including these lions, tigers, leopards, snow leopards, clouded leopards, cheetahs, and ocelots—observing many of these felids displaying visible signs of distress, including abnormal repetitive pacing, was particularly disturbing for the PETA member(s).

373.   The PETA member(s) felt depressed after seeing many of the Listed Species at Kirshner in this condition, with a member noting that when they looked into some of these animals' eyes, they looked like they were "dead inside."

374.   The experience was "shocking," and left the member(s) with lasting sadness,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

frustration, and a sense of helplessness. The member(s) had hoped to see these animals cared for adequately, but instead saw evidence of suffering and chronic neglect.

375.   After viewing the animals at Kirshner, including Listed Species, in this condition, the PETA member(s) felt compelled to inform others about the conditions at Kirshner and to educate people in their community (who may have otherwise visited the facility) that Kirshner was not a sanctuary, but rather a "prison" for animals.

376.   Although they have a strong desire to see these animals again, the member(s) have been deterred from returning to the facility because doing so would likely expose them to the same disturbing conditions and emotional pain.

377.   The member(s) would, however, continue to visit these protected animals if they were transferred to a reputable, properly accredited facility.

378.   If the Listed Species are moved to a properly accredited facility, the member(s) would enjoy watching them engage in species-typical behaviors in appropriate, enriched, and safe environments where they will not be exposed to conditions that cause them visible suffering, and where they will receive proper nutrition and veterinary care.

## VII.   CLAIMS FOR RELIEF

### Count I: Unlawful Take of a Protected Species

379.   PETA incorporates by reference all allegations of the Complaint.

380.   The Endangered Species Act, 16 U.S.C. § 1538(a)(1)(B), (G), and its implementing regulations, 50 C.F.R. §§ 17.21(a) & (c), 17.31(a), prohibit the "take" of "any [listed] species" not otherwise provided for by a Section 4(d) special rule, within the United States without a permit.

381.   Defendants Barry R. Kirshner Wildlife Foundation ("Kirshner") and Roberta Kirshner have violated and continue to violate the ESA and its implementing regulations by taking ring-tailed lemurs, tigers, lions, lion/tiger hybrids, leopards, snow leopards, clouded leopards, cheetahs, and an ocelot within the meaning of the ESA, without a permit, at Kirshner.

382.   Defendants Sean Castro and Brian Thomas are liable under the ESA because—in their capacities as officers of the Barry R. Kirshner Wildlife Foundation and owners of the real property encompassing Kirshner's facilities during periods when takes of Listed Species

1    occurred—they caused, enabled, and/or substantially contributed to the conditions that harmed,

2    harassed, and killed Listed Species. They are also liable under the ESA because they enabled

3    Kirshner's successors to continue or attempt to continue the takes of Listed Species, by transferring

4    Kirshner's facilities and operations to Kirshner's successors.

5        383.    Defendants Janra Enterprises, Terrific, LLC, Big Cat Rescue and/or California

6    Wildlife Refuge, Ryan Carlson, Megan Swartz, and John-Thomas Terlitsky are poised to assume

7    ownership or possession of these Listed Species, and unless enjoined, will continue or exacerbate

8    the same unlawful practices, constituting an imminent "take" within the meaning of the ESA.

9        384.    Defendants Janra Enterprises, Terrific, LLC, Big Cat Rescue (a/k/a California

10   Wildlife Refuge), Ryan Carlson, Megan Swartz, and John-Thomas Terlitsky's possession of the

11   Listed Species subjected to the unlawful takings described herein constitute a separate and

12   independent violation of the ESA under 16 U.S.C. § 1538(a)(1)(D) and 50 C.F.R. § 17.21(d), which

13   make it unlawful for any person to "possess . . . any [] species taken in violation of [the ESA]."

14       385.    Plaintiff seeks injunctive relief to prevent the transfer of any ESA-listed animals to

15   Janra Enterprises and its affiliates, who have no experience in caring for federally-protected captive

16   wildlife and are not equipped to meet ESA standards.

## Prayer for Relief

18       WHEREFORE, PETA respectfully requests that this Court:

19       386.    Declare that Defendants violated the ESA by illegally taking, or possessing illegally

20   taken, ring-tailed lemurs, tigers, lions, lion/tiger hybrids, leopards, snow leopards, clouded

21   leopards, cheetahs, and an ocelot. 16 U.S.C. § 1538(a)(1)(B), (D), (G); 50 C.F.R. §§ 17.21(a) &

22   (c)-(d), 17.31(a).

23       387.    Enjoin Defendants from continuing to violate the ESA and its implementing

24   regulations with respect to one (1) ring-tailed lemur (Lulu), six (6) tigers (David Alan II, Lapua,

25   Adara, Zuri, Savara, and Dana), four (4) lions (Leyah, Lucie, Samson, and Amari), three (3)

26   lion/tiger hybrids (Isaac, Topaz, and Outlaw), four (4) leopards (Axle, Royal, Amur, and Tshuma),

27   one (1) clouded leopard (Bow), one cheetah (Mema); and any of the Listed Species' subsequently-

28   born offspring;

388.    Enjoin Defendants from owning, possessing, managing the care of, or otherwise providing care for endangered or threatened species, and from owning or controlling the facilities or real property where endangered or threatened species are housed, in the future;

389.    Enter a permanent injunction against Defendants that terminates all Defendants' ownership and possessory rights with respect to one (1) ring-tailed lemur (Lulu), six (6) tigers (David Alan II, Lapua, Adara, Zuri, Savara, and Dana), four (4) lions (Leyah, Lucie, Samson, and Amari), three (3) lion/tiger hybrids (Isaac, Topaz, and Outlaw), four (4) leopards (Axle, Royal, Amur, and Tshuma), one (1) clouded leopard (Bow), and one (1) cheetah (Mema);

390.    Determine the most appropriate reputable facilities for the forfeited animals and order the transfer of the forfeited animals to those facilities, consistent with the animals' best interests;

391.    Award PETA reasonable attorneys' fees and litigation costs for this action, 16 U.S.C. § 1540(g)(4); and

392.    Grant PETA such other and further relief as the Court deems just and proper.

Date:    July 1, 2025                    Respectfully submitted,

                                        */s/ Chris A. Hollinger*
                                        Chris A. Hollinger (SBN 147637)
                                        chollinger@omm.com
                                        Kaitlyn A. Gosewehr (SBN 313458)
                                        kgosewehr@omm.com
                                        Andrew N. Ezekoye (SBN 360536)
                                        aezekoye@omm.com
                                        O'MELVENY & MYERS LLP
                                        2 Embarcadero Ctr. 28th Floor
                                        San Francisco, California 94111
                                        Telephone:    (415) 984-8700
                                        Facsimile:    (415) 984-8701

                                        Laura K. Kaufmann (SBN 329714)
                                        lkaufmann@omm.com
                                        O'MELVENY & MYERS LLP
                                        400 South Hope Street
                                        Suite 1900
                                        Los Angeles, California  90071-2811
                                        Telephone:    +1 213 430 6000
                                        Facsimile:    +1 213 430 6407

                                        Asher Smith (NY Bar #5379714)*
                                        ashers@petaf.org

Raquel Panza (NY Bar #5963251)*
rpanza@petaf.org
PETA FOUNDATION
1536 16th Street NW
Washington, DC 20036
(202) 483-7382; (202) 540-2208 (fax)
[*Application to appear *pro hac vice* forthcoming]

*Counsel for Plaintiff People for the Ethical Treatment
of Animals, Inc.*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF